IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

LIBERTARIAN PARTY OF TENNESSEE, )
ANTHONY WALL, GREEN PARTY OF )
TENNESSEE, KATHLEEN A. CULVER, )
CONSTITUTION PARTY OF )
TENNESSEE and JOAN CASTLE, )
                   )
        Plaintiffs, )
                   )
v. )      Case No. 3:08-0063
                   )      Judge Haynes
MARK GOINS, Coordinator of )
Elections for the State of Tennessee, and )
TRE HARGETT, Secretary of State for the )
State of Tennessee, )
                   )
        Defendants. )

---

# MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
# MOTION FOR SUMMARY JUDGMENT

---

Defendants, the Coordinator of Elections for the State of Tennessee and the Secretary of

State for the State of Tennessee, hereby submit this memorandum of law in support of their

motion for summary judgment pursuant to Fed. R. Civ. P. 56.

## INTRODUCTION AND FACTUAL BACKGROUND

Plaintiffs, the Libertarian Party of Tennessee ("LPT"), the Constitution Party of

Tennessee ("CPT") and the Green Party of Tennessee ("GPT"), as well as three individual

members of each party (Anthony Wall, Joan Castle and Kathleen A. Culver) have filed suit challenging Tennessee's statutes setting forth the procedures for an organization to obtain recognition as a statewide political party in Tennessee. Specifically, Plaintiffs challenge the constitutionality of Tenn. Code Ann. §§ 2-1-104(a)(14) and (30); Tenn. Code Ann. § 2-1-107; Tenn. Code Ann. § 2-1-114; Tenn. Code Ann. §2-13-201(a); and Tenn. Code Ann. § 2-13-202, alleging that these statutes, particularly as they relate to the "early and vague petition signature deadline, petition signature number required, and requirement that petition signers must state they are members of the new political party," violate their rights under the First and Fourteenth Amendment, as they are not framed in the least restrictive manner necessary to achieve legitimate state interests in regulating ballot access and new political party formation.

### Tennessee's Statutory Scheme for Obtaining Recognition as Statewide Political Party

Tennessee's election laws define a political party as "an organization which nominates candidates for public office." Tenn. Code Ann. § 2-1-104(a)(14). In order to obtain recognition as a *statewide* political party, an organization must meet one of the following requirements:

1. Within the last four years, have at least one candidate for an office to be elected by voters of the entire state receive at least five percent (5%) of the number of votes cast for all gubernatorial candidates in the most recent election for governor; or

2. File with the State Coordinator of Elections a petition signed by registered voters totaling at least two and a half percent (2 ½%) of the total number of votes cast for governor in the last election for governor.

Tenn. Code Ann. § 2-1-104(a)(30). Pursuant to this statute, achieving statewide political party status by filing petitions lasts for only one year. Thus, unless the party has a candidate who receives a number of votes at least equal to the amount specified in paragraph one above, its

2

status as a recognized statewide political party would lapse and the organization would have to file petitions again in order to regain that status.

Tennessee's election laws require that each political party have a state executive committee which shall be the state primary board for the party. Tenn. Code Ann. § 2-13-102(a). Once an organization obtains recognition as a statewide political party, its first state executive committee is to be selected at a statewide convention of the party. The chair and secretary of the convention are required to certify the election of the members of the committee to the State Coordinator of Elections not less than ninety (90) days before the next regular August election. The term of the first members of the party's state executive committee expires on September 15th after the regular August election in a gubernatorial election year. Tenn. Code Ann. § 2-13-107.[1] Once the members of the state executive committee have been certified, they have all the powers and duties of a state primary board. Tenn. Code Ann. § 2-13-107(c).

A statewide political party is required to nominate its candidates for four offices – governor, general assembly members, U.S. Senator and U.S. Representative – by primary election. They may nominate their candidates for all other offices by any method authorized under the rules of the party or by primary election under this title. Tenn. Code Ann. §§ 2-13-202, 203.[2] Tenn. Code Ann. § 2-5-101(a)(1) provides that both independent and primary candidates for any office to be filled at the regular November election for which a primary is required to be held at the regular August election shall qualify by filing such candidate's nominating petition no later than twelve o'clock (12:00) noon, prevailing time, on the first

---

[1] Members of the state executive committee for a statewide political party are otherwise elected at the regular August primary election immediately before the election of the governor. Tenn. Code Ann. § 2-13-103.

[2] One reason why the election of a state executive committee is necessary is because under Tennessee election laws, any primary election contest is decided by the party's state executive committee. *See* Tenn. Code Ann. § 2-17-104.

3

Thursday in April.[3]  Subsection (a)(2) provides that, with respect to any office to be filled at the regular August election, if no May primary is called for, then all candidates shall qualify by also filing their petitions no later than twelve noon on the first Thursday in April.[4]  In order to qualify as a candidate for any office, whether as candidate in the primary election or as an independent in the general election, Tennessee's election laws only require the filing of a nominating petition signed by the candidate and twenty-five (25) or more registered voters who are eligible to vote to fill the office by the qualifying deadline, with the exception of independent presidential candidates.  For independent presidential candidates, the statutes require a petition to be signed by the candidate and twenty-five (25) or more registered voters for each elector allocated to Tennessee (*i.e.,* 275 signatures of registered voters).  Tenn. Code Ann. § 2-5-101(b)(1).

Accordingly, since the names of the state executive committee members for a statewide political party must be certified to the State Coordinator of Elections at least ninety (90) days before the August election and since party primary candidates for the office of governor, general assembly member, U.S. Senator and U.S. Representative must qualify by the first Thursday in April, the Coordinator of Elections requires that the petitions to obtain recognition as a statewide political party must be filed at least thirty (30) days before the qualifying deadline for the August state primary, *i.e.*, the first Thursday in March.  This is to allow an administrative period for verifying signatures and determining whether the petitions are sufficient to confer statewide

---

[3] The offices of governor, general assembly member, U.S. Senator and U.S. Representative are all offices that are filled at the regular November election for which a primary is required to be held at the regular August election.

[4] It should be noted that the procedures and deadlines for qualifying as a presidential candidate are entirely different.  If a statewide political party chooses to participate in Tennessee's presidential preference primary, which is held on the first Tuesday in February, the deadline for qualifying is the first Thursday in November before the primary election.  Tenn. Code Ann. § 2-13-305(a) and § 2-5-101(a)(2).  Otherwise, the deadline for candidates of statewide political parties and independent candidates to qualify is the third Thursday in August before the November election.  Tenn. Code Ann. § 2-5-101(a).

4

political party status on an organization. *See* Affidavits of Mark Goins and Brook Thompson attached as Exhibits A and B to Defendants' Motion for Summary Judgment.

In addition to the other requirements discussed above, Tennessee's elections laws require that before a political party may have its nominees on a ballot or exercise any of the rights of political parties, it must have filed with the State Coordinator of Elections a copy of the rules under which the party and its subdivision operate. Tenn. Code Ann. § 2-1-114. It is undisputed that none of the Plaintiff political parties has filed a copy of their rules with the State Coordinator of Elections. *See* Affidavit of Mark Goins, Exhibit A.[5]

Tennessee has a population of approximately 6.2 million and currently has over 3.8 million registered voters. *See* Affidavit of Mark Goins, Exhibit A. In registering to vote, Tennessee's election laws require that an individual provide the following information:

- Full name
- Sex
- Legal residence and mailing address if different from legal residence
- Social security number
- Date of birth
- U.S. citizenship
- Where last registered to vote, if applicable
- Tennessee residency
- Felony convictions, if any and pardon or restoration of rights

Tenn. Code Ann. § 2-1-116. Tennessee does not and has not ever required that an individual register by political party affiliation. *See* Affidavits of Mark Goins and Brook Thompson, Exhibits A and B.

In the mid-1990's, the State Division of Elections developed a handout titled "Procedures for Recognition as a Statewide or Local Political Party in Tennessee" and has updated it on a regular basis. *See* Exhibit 1 to Affidavit of Beth Henry-Robertson attached as Exhibit C to

---

[5] The LPT and the GPT both have by-laws under which they operate; however, the CPT does not have any by-laws or other rules under which the party operates.

Defendants' Motion for Summary Judgment. This hand-out is routinely provided in the first instance to any individual or organization who inquires about the process for obtaining recognition as a statewide political party. *Id.* If an organization decides to pursue the petition process outlined in the handout and notifies the State Division of Election, the Division then calculates the deadline for when the organization's petitions are due. The Division will then work with an organization to approve the format of the organization's petition. *Id.* In approving the format of a petition, the Division looks to see that the petition includes the following three things: (1) title, *i.e.*, what the petition is for; (2) a summary or statement of the purpose of the petition; and (3) appropriate space for the signatures of registered voters, including space not only for the person's signature, but also for the person to print his/her name and provide their full address, including the county. The Division does not in any way mandate the language to be used in the petition nor does it review the language used, particularly in the summary of the petition. *See* Affidavit of Beth Henry-Robertson and Exhibit 2 attached thereto. If an organization subsequently submits petitions containing the signatures of registered voters, the State Division of Elections (in conjunction and cooperation with the county election commissions) then reviews and certifies the registration of the voters. It does not, however, certify, review or otherwise make any determination as to whether the registered voters are also members of the party in question. Thus, the State Division of Elections has rejected – and would continue to reject – a signature *only* if it is not the signature of a registered voter.[6] *See* Affidavits of Mark Goins, Brook Thompson and Beth Henry-Robertson, Exhibits A, B and C.

---

[6] Similarly, the State Division of Elections would only reject a petition if it did not contain the signatures of registered voters. *Id.*

## Libertarian Party of Tennessee

While the national Libertarian Party was established in 1971, it is uncertain as to when the Libertarian Party of Tennessee ("LPT") was first established. It is currently divided into four geographic regions (Mountain, Delta, Heartland and Valley), with an individual coordinator serving each of these regions. *See* Deposition of Anthony Wall at p. 11, attached as Exhibit D to Defendants' Motion for Summary Judgment (hereinafter referred to as "Wall Deposition"). The LPT has approximately six to seven county affiliates and several regional affiliates (*e.g.*, Upper Cumberland, Tri-Cities). [7] *See* Exhibit D, Wall Deposition at p. 60. The LPT currently has approximately 1,980 members. *See* Exhibit D, Wall Deposition at p. 59; LPT Responses to Interrogatories attached as Exhibit E to Defendants' Motion for Summary Judgment.

Membership in either the national Libertarian Party or a county or regional affiliate automatically confers membership in the LPT.[8] Membership requirements in the LPT are otherwise intentionally vague. Essentially, if an individual participates in the LPT at the state level, either through its state website, blog sites or other forms of activism, such individual is considered to be a member of the LPT. However, in order to actually participate in the LPT's business (*i.e.*, vote), an individual must be accepted by the delegates at the LPT's state convention upon a recommendation of an officer of the party or a regional coordinator. Exhibit D, Wall Deposition at 57-58; Exhibit 4 to Wall Deposition. The LPT does not maintain any official headquarters or paid staff, although it does operate a website. The LPT also does not have any rules or procedures by which the party operates other than its By-Laws. *See* Exhibit D,

---

[7] Tennessee has ninety-five counties.

[8] According to the By-Laws for the national Libertarian Party, membership is obtained through a "non-initiation" pledge, *i.e.*, statement that individual opposes the initiation of force to achieve political or social goals. An individual can also become a sustaining member of the national party by giving at least $25 to the party on an annual basis.

Wall Deposition at p. 71; Exhibit 4 to Wall Deposition. The LPT does hold an annual convention.

Since at least 1976, there has been a presidential candidate on the ballot in Tennessee that has been endorsed by the LPT as their candidate. *See* Exhibit E, Response No. 5. However, all of these candidates have received less than one percent (1%) of the vote in the presidential election. *Id.* While these candidates have been endorsed and actively supported by the LPT, they were listed on the ballot as independent candidates, with the exception of the LPT's presidential candidate in the November 2000 presidential election.

In 2000, the Tennessee General Assembly enacted the "Fair Ballot Access Act of 2000." That Act provided that, if the presidential candidate of a party that was not a statewide political party had received more than five thousand (5,000) votes in Tennessee in the November 1996 presidential election, then that party's presidential candidate in the November 2000 presidential election could "elect to have the candidate's party name included in the space allocated on the ballot for the candidate together with the name of such candidate." *See* Public Acts of 2000, Chap. 883, § 1 (codified at Tenn. Code Ann. § 2-5-208(d)(1)). This Act further provided that such non-statewide political party could have its presidential candidate recognized on the ballot as the party's candidate in future presidential elections if its presidential candidate received at least five percent (5%) of the votes cast in Tennessee in the last presidential election. *Id.* In the November 2000 presidential election, however, the LPT's candidate (Harry Browne) only received .21% of the votes cast in Tennessee. *See* Exhibit E, Response No. 5; Wall Deposition at 39-40.

As previously discussed, in order to obtain recognition as a statewide political party, Tennessee's election laws require that an organization either (1) have at least one candidate for a

8

statewide office receive at least five percent (5%) of the number of votes cast for all gubernatorial candidates in the most recent election for governor or (2) the State Coordinator of Elections a petition signed by registered voters totaling at least two and a half percent (2 ½%) of the total number of votes cast for governor in the last election for governor. The LPT has never met either of these requirements. Specifically, the LPT has never had a candidate for a statewide office that has received at least five percent of the number of votes cast for all gubernatorial candidates in the most recent election for governor. *See* Exhibit E, Response No. 5; Exhibit D, Wall Deposition at 37-38.[9] The LPT has also never taken *any action* to obtain recognition as a statewide political party through the petition process. *See* Exhibit D, Wall Deposition at 41-43; Exhibit E, Response Nos. 6 and 10.

## The Constitution Party of Tennessee

The Constitution Party of Tennessee ("CPT") was established in 1992 by Plaintiff Joan Castle and Darrell Castle.[10] *See* Deposition of Joan Castle at p. 8, attached as Exhibit F to Defendants' Motion for Summary Judgment (hereinafter referred to as "Castle Deposition"). The CPT does not have a charter, by-laws, or any rules of proceeding. It has no formal registration of members, but instead, considers people who are on its mailing list to be members of the organization. The CPT currently has 631 names on its mailing list. *See* CPT's Responses to Interrogatories, Response No. 14, attached as Exhibit G to Defendants' Motion for Summary Judgment. The CPT does not have regular meetings, although it may meet once every four years. It does not keep minutes of any of its meetings, nor does it keep any records of the actions

---

[9] The LPT has also never had a candidate for a statewide office that has received at least five percent (5%) of the votes cast in that election. *See* Exhibit E, Response No. 5.

[10] Darrell Castle is co-counsel for the Plaintiffs.

9

or activities of the CPT. Like the LPT, it does not maintain an office space or paid staff. Exhibit F, Castle Deposition. at 52-56. Essentially, the CPT is "a group of people in the state who all agree that [they] are members of an affiliate of the [National] Constitution Party." *Id.* at 53 (lines 4-6).

Since 1992, there has been a presidential candidate on the ballot in Tennessee that has run as the CPT's candidate. *See* Exhibit G, Response No. 5. All of these candidates have received less than one percent (1%) of the vote in the presidential election. *Id.* While these candidates have been endorsed and actively supported by the CPT, they were listed on the ballot as independent candidates, with the exception of the CPT's presidential candidate in the November 2000 presidential election. Pursuant to the "Fair Ballot Access Act of 2000" (codified at Tenn. Code Ann. § 2-5-208(d)(1)), the CPT's presidential candidate was listed on the ballot as the candidate of the Constitution Party in the November 2000 presidential election. However, the CPT's candidate (Howard Phillips) only received .05% of the votes cast in Tennessee. *See* Exhibit G, Response No. 5.

As previously discussed, in order to obtain recognition as a statewide political party, Tennessee's election laws require that an organization either (1) have at least one candidate for a statewide office receive at least five percent (5%) of the number of votes cast for all gubernatorial candidates in the most recent election for governor or (2) the State Coordinator of Elections a petition signed by registered voters totaling at least two and a half percent (2 ½%) of the total number of votes cast for governor in the last election for governor. The CPT has never had a candidate for a statewide office that has received at least five percent of the number of

votes cast for all gubernatorial candidates in the most recent election for governor. *See* Exhibit G, Response No. 5.[11]

The CPT has only made one attempt to obtain recognition as a statewide political party through the petition process. According to Plaintiff Joan Castle, former chair of the CPT, as a result of the 2000 presidential elections, the CPT began in 2001 working towards obtaining recognition as a statewide political party for the 2004 presidential elections. Specifically, on August 13, 2001, Plaintiff Castle contacted the State Division of Elections to inquire as to what was required in order to obtain recognition. Plaintiff Castle was told that the CPT needed to obtain 24,406 approved signatures, conduct a statewide meeting and elect a State Executive Committee, appoint county primary boards (5 per county) and nominate candidates for Governor, General Assemblyman, U.S. Senator and U.S. Representative. *See* Exhibit G, Response No. 6; Exhibit F, Castle Deposition at p. 39.

After several conversations with the State Election Division, the CPT was provided with a petition that either had been prepared or approved by the State Election Division. *See* Exhibit F, Castle Deposition at p. 40, 61; Exhibit 2 to Castle Deposition; *see also* Exhibit G, Response No. 6. The petition, which seeks recognition of the CPT as a statewide political party, does not contain any requirement that the individual signing the petition be a member of the CPT. *See* Exhibit F, Castle Deposition at p. 61; Exhibit 2 to Castle Deposition. In obtaining signatures on their petition, the CPT did not inquire as to whether the person signing the petition was a member of the CPT. *See* Exhibit G, Response Nos. 8 and 12 (f). The CPT ultimately obtained somewhere between 11,000 and 16,000 signatures, but it is unclear whether all of these

---

[11] The CPT has actually never had an endorsed candidate for a statewide office. It has only had endorsed presidential candidates. *See* Castle Deposition at p. 30; Exhibit G, Response No. 5.

signatures were submitted to the State Election Division for verification.[12]  In any event, the CPT did not submit petitions containing the required 24,406 signatures to the State Election Division. *See* Thompson Affidavit; *see also* Affidavit of Beth Henry-Robertson, Exhibit C.

## The Green Party of Tennessee

The Green Party of Tennessee ("GPT") was initially established in 1992-1993, however, the members were unable to keep a "core group together that went from election to election." *See* Deposition of Kathleen Culver at p. 12, attached as Exhibit H to Defendants' Motion for Summary Judgment (hereinafter referred to at "Culver Deposition").  The GPT was re-established in 1999-2000 in time for the 2000 Presidential election.  *Id.*  The GPT does have By-Laws and Rules for the GPT's Nominating Convention and Presidential Candidate Election. (Copies attached as Exhibits I and J, respectively, and incorporated herein by this reference.) According to the By-Laws, the administrative body of the GPT is a "state coordinating committee" ("SCC"), which is supposed to consist of two co-chairs; one representative from each affiliated Local organization; four at-large members; one college member and one high school member.  The By-Laws further require that the SCC meet on a quarterly basis and that minutes of its meetings be kept.  The B-y-Laws also require that the GPT conduct an Annual

---

[12] The CPT's Responses to the Interrogatories state that, during the period of August through November 2001, 5,430 signatures were obtained but the Responses do not indicate whether these signatures were ever submitted to the State Election Division for verification.  *See* Exhibit G, Response Nos. 7 and 11.  However, in her deposition, Plaintiff Castle testified that copies of the petition containing the 5,430 signatures were submitted to the State Election Division in November 2001, but that no further petitions were ever submitted.  Exhibit F, Castle Deposition at p. 43.  Furthermore, Plaintiffs' expert report states that the CPT had obtained 11,000 signatures by January 2002  and  Plaintiff Castle testified that approximately 16,000 signatures were obtained.  *Id.* at pp. 64-66. However, according to the records of the State Division of Elections, 293 petitions containing approximately 4200 signatures were filed with the Division by the CPT on September 6, 2001.  Another 345 petitions containing approximately 5,000 signatures were filed on November 2, 2001.  No further petitions were filed by the CPT after that date.  *See* Affidavit of Beth Henry Robertson, Exhibit C.

Meeting for the purposes of executive and administrative matters, and changes to by-laws and the party platform. *See* Exhibit I, Article IV.B and Article V.

With respect to nominating conventions, the By-Laws require that a Presidential Nominating Convention be called at a minimum one month before the Green Party of the US Presidential nominating convention, and for state-wide offices, nominating conventions are to be called at a minimum of one month prior to any and all related State of Tennessee candidate filing deadlines. *See* Exhibit I, Article V.C.

Membership in the GPT is obtained through "self-recognition and agreement to the Ten Key Values." *See* Exhibit H, Culver Deposition at p. 47; Exhibit I, Article III.A. A member obtains voting rights by submitting a signed copy of the 10 Key Value pledge form to the SCC. Exhibit H, Culver Deposition at 48; Exhibit I, Article III.A. The GPT currently has six local parties or organizations located in the tri-cities area, Davidson, Knox, Hamilton, Shelby and Perry counties. Because membership in the GPT can be obtained simply by self-recognition, the GPT has no official record of its membership; however the number of people served by the GPT and its county chapters through services such as email listserv, newsletters and correspondence is approximately 500. *See* GPT's Responses to Interrogatories, Response No. 14, attached as Exhibit K to Defendants' Motion for Summary Judgment; Exhibit H, Culver Deposition at 50-51.

Since the GPT was re-established in 1999-2000, it has only had two presidential candidates on the ballot in Tennessee. *See* Exhibit K, Response No. 5. In 2000, pursuant to the "Fair Ballot Access Act of 2000" (codified at Tenn. Code Ann. § 2-5-208(d)(1)), the GPT's presidential candidate was listed on the ballot as the candidate of the Green Party in the November 2000 presidential election. However, the GPT's candidate (Ralph Nader) only

13

received .95% of the votes cast in Tennessee. The GPT's candidate in 2008, Cynthia McKinney, only received .10% of the vote. *See* Exhibit K, Response No. 5; GPT's Supplemental Responses to Defendants' First Set of Interrogatories, Response No. 5, attached as Exhibit L to Defendants' Motion for Summary Judgment.[13]

Like both the LPT and the CPT, the GPT has never had a candidate for a statewide office that has received at least five percent of the number of votes cast for all gubernatorial candidates in the most recent election for governor and thus, has not obtained recognition as a statewide political party through that process. *See* Exhibit K, Response No. 5; Exhibit L, Response No. 5.[14] The GPT has also *never attempted* to obtain recognition as a statewide political party through the petitioning process, even though the GPT had recognized that it was attainable goal that the party should work hard to meet. *See* Minutes of the Green Party of Tennessee Annual Meeting May 23-24, attached as Exhibit 2 to Exhibit H, Culver Deposition ("The first step of registering to be acknowledged as a statewide political party and gain ballot access is to secure 41,329 registered voter signatures on a petition stating that the Green Party should be considered a valid political party in our state. We need to do this and submit it to Nashville by January 2006. This goal is attainable and we should work hard to meet it."); Exhibit K, Response Nos. 6 and 10.[15]

---

[13] Although these supplement responses were requested on November 13, 2009, they were not provided to Defendants' counsel until two months later (January 15, 2010) and the same deadline for the parties to file motions for summary judgment.

[14] Like the LPT, the GPT has never had a candidate for a statewide office that has received at least five percent (5%) of the votes cast in that election. *See* Exhibit K, Response No. 5.

[15] The GPT again considered pursuing recognition as a statewide political party through the petition process in January and August 2007, but decided not to pursue the process. *See* "GPTN State CC 01/24/2007 minutes attached as Exhibit 6 to Exhibit H, Culver Deposition ("On national level, there is a move towards new allocation of delegates. Signatures on the ballot petition will help us at the national level. It is also a really good tool to talk with people about the GP. May be a good idea to go through the process of collecting signatures in conjunction with the lawsuit."); GPTN State CC 08/03/2007 Minutes" attached as Exhibit 7 to Exhibit H, Culver Deposition ("Katey led

## STANDARD OF REVIEW FOR SUMMARY JUDGMENT

Fed. R. Civ. P. 56(c) provides that summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Chao v. Hall Holding Co.*, 285 F.3d 415, 424 (6th Cir. 2002). The party moving for summary judgment has the burden of showing that there exists no genuine issue of material fact, and the evidence, together with all inferences that can reasonably be drawn therefrom, must be read in the light most favorable to the party opposing the motion. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157-59 (1970); *CenTra, Inc. v. Estrin*, 538 F.3d 402, 412 (6th Cir. 2008). However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986); *Harrison v. Ash*, 539 F.3d 510, 516 (6th Cir. 2008).

Once a moving party has met its burden of production, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 483 (6th Cir. 2008) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). The nonmoving party cannot rely upon the assertions in its pleadings; rather that party must come forward with probative evidence such as sworn affidavits, to support its claims. *Celotex*, 477 U.S. at 324; *Martin v. Ohio Turnpike Comm'n.*, 968 F.2d 606 (6th Cir. 1992), *cert. denied*, 506 U.S. 1054 (1993). "If the evidence is merely colorable, or is not

---

a discussion of petitioning for ballot access. We need about 46,000 ballot signatures . . . We should make a good-faith effort to maintain – to meet this standard, which is obviously exclusionary in intention.").

significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249-50 (citations omitted). "The mere possibility of a factual dispute is not enough." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992). Therefore, a court must make a preliminary assessment of the evidence, in order to decide whether the plaintiff's evidence concerns a material issue and is more than de minimis. *Hartsel v. Keys*, 87 F.3d 795 (6th Cir. 1996).

However, in determining whether there is a genuine issue of material fact, "[a] district court is not . . . obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *Interroyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989), *cert. denied*, 494 U.S. 1091 (1990). Thus, a court is entitled to rely only upon those portions of the verified pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties.

Finally, in reviewing a party's motion for summary judgment, a court's function is not to "weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 249. In doing so, all evidence must be viewed in the light most favorable to the nonmoving party. *Id.* However, a mere scintilla of evidence is insufficient to defeat a motion for summary judgment. *In re Petty*, 538 F.3d 431, 439 (6th Cir. 2008). Rather, there must be evidence on which the jury could reasonably find for the nonmoving party. *Id.* Furthermore, a district court need not view the facts in the light most favorable to the nonmoving party if that party's version of the events is "blatantly contradicted by the record, so that no reasonably jury could believe it." *Scott v. Harris*, 550 U.S. 372, 380 (2007); *see also Marvin v. City of Taylor*, 509 F.3d 234 (6th Cir. 2007). Ultimately, the standard for determining whether summary judgment is appropriate is whether the evidence presents a

16

sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.

## ARGUMENT

### A. Plaintiffs LPT and GPT Lack Standing To Challenge The Constitutionality of Tennessee's Statutes For Obtaining Recognition as a Statewide Political Party.

Plaintiffs LPT and GPT lack the necessary standing to assert the claims in their Complaint, which presents an insurmountable obstacle to this Court's adjudication of their claims. Article III of the United States Constitution gives federal courts jurisdiction only over "cases and controversies," of which the component of standing is an "essential and unchanging part." *Hooker v. Sasser*, 893 F.Supp 764, 766 (M.D.Tenn. 1995) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351, 363-64 (1992)). Thus, a party seeking to invoke this Court's jurisdiction must establish the necessary standing to sue before this Court may consider the merits of that party's cause of action. *Id.* (citing *Whitmore v. Arkansas*, 495 U.S. 149, 154, 110 S.Ct. 1717, 1722, 109 L.Ed.2d 135, 144-45 (1990)). Thus, "[t]he question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues. This inquiry involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise." *Lac Vieux Desert Band of Lake Superior Chippewa Indians v. Michigan Gaming Control Board*, 172 F.3d 397, 403 (6th Cir. 1999) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)).

17

The United States Supreme Court has set forth the three elements which comprise "the irreducible constitutional minimum of standing": (1) the plaintiff must have suffered an injury in fact; (2) there must be a causal connection between the injury and the challenged conduct; and, (3) it must be likely that a favorable decision will remedy the injury. *Hooker v. Sasser*, 893 F.Supp. at 766-67 (citing *Lujan*, 504 U.S. at 560). *See also Froelich v. Federal Election Com'n*, 855 F.Supp. 868, 869 (E.D.Va. 1994). Furthermore, an injury in fact must consist of "an invasion of a legally-protected interest" which is "concrete and particularized," as well as one which is actual or imminent and not simply "conjectural" or "hypothetical." *Id.*

The primary focus of a standing inquiry is on the party, not on the merits of the claim. *Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 484, 102 S.Ct. 752, 765, 70 L.Ed.2d 700 (1982) and *Flast v. Cohen*, 392 U.S. 83, 99, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947 (1968). Although standing does not depend on the merits, it often runs on the nature and source of the claim asserted and, therefore, a standing inquiry requires a "careful judicial examination of the complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted." *Id.* Furthermore, when the claimed injury involves the violation of a statute, the court must determine "whether the . . . statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief." *Warth v. Seldin*, 422 U.S. at 500. In addition to these constitutional requirements, federal courts have established certain prudential principles that affect standing. *See Coyne v. American Tobacco Co.*, 183 F.3d 488, 494 (6th Cir. 1999). These prudential limitations enforce the principle that "the plaintiff must be a proper proponent, and the action a proper vehicle, to vindicate the rights asserted. *Pestrak v. Ohio Elections Comm'n*, 926 F.2d 573, 576 (6th Cir. 1991).

18

A plaintiff bears the burden of demonstrating standing and must plead its components with specificity. *Valley Forge*, 454 U.S. at 472. Moreover, an alleged injury must be "direct" to constitute an injury sufficient to support standing." *See Taub v. Commonwealth of Kentucky*, 842 F.2d 912, 918 (6th Cir. 1988). Article III requires that a plaintiff show that he " 'personally has suffered some actual or threatened injury'" as a result of the allegedly illegal conduct of the defendant. *Valley Forge*, 454 U.S. at 472 (quoting *Gladstone, Realtors v. Village of Bellwood*, 441 U.S. 91, 99 (1979)).

Both the LPT and GPT have challenged the constitutionality of Tennessee's statutes for obtaining recognition as statewide political parties as applied to them – specifically, the statutes concerning the petition process.[16] However, it is undisputed that neither the LPT nor the GPT since their inception has ever attempted to even try to comply with those statutes, *i.e.*, neither party has ever attempted to obtain recognition as a statewide political process by obtaining the requisite number of signatures on petitions. *See* Exhibit D, Wall Deposition at 41-43; Exhibit E, Response Nos. 6 and 10; Exhibit K, Response Nos. 6 and 10. Nor has either of these Plaintiffs presented any evidence of their intent to obtain recognition as a statewide political party through the petition process in the future.[17] Consequently, neither of these Plaintiffs can demonstrate that they have suffered an actual or threatened injury as a result of the application of these statutes to them and, therefore, cannot establish two of the three required elements of standing – injury in

---

[16] Plaintiffs LPT, CPT and GPT have also made a facial challenge to the constitutionality of Tennessee's statutes governing the process for obtaining recognition as a statewide political party. However, the Supreme Court has recently affirmed that, in order to succeed on a facial challenge to a statute, a plaintiff must establish that no set of circumstances exists under which the statute as written would be valid and that the law is unconstitutional in all of its applications. *See Washington State Grange v. Washington State Republican Party*, 128 S.Ct. 1184, 1190 (2008); *see also Crawford v. Marion County Election Board*, 128 S.Ct. 1610, 1623 (2008 (rejecting a challenge to the facial constitutionality of Indiana's voter identification law). None of the Plaintiffs has alleged, much less presented any evidence that no set of circumstances exists under which the statutes as written would be valid and that the statutes are unconstitutional in all of their application.

[17] Indeed, none of the Plaintiff parties even allege in their complaint that they intend to obtain recognition as a statewide political process through the petition process in the future.

19

fact and a causal connection between the injury and the alleged conduct. Accordingly, the Defendants are entitled to summary judgment in their favor as against Plaintiffs LPT and GPT.

## B. The "Membership" Provision of Tenn. Code Ann. § 2-1-104(a)(30) Does Not Violate Plaintiffs' First and Fourteenth Amendment Rights.

Initially, it should be noted that in making any judgment about the constitutionality of the statutes in question, this Court should keep in mind that state legislatures are presumed by federal courts to have acted constitutionally in making laws. *See McDonald v. Board of Election Commissions*, 394 U.S. 802, 809 (1969); *Harford Fire Ins. Co. v. Lawrence, Dykes, Goodenberger, Bower & Clancy*, 740 F.2d 1362, 1366 (6th Cir. 1984).

> A statute will be presumed to be constitutional by the courts unless the contrary clearly appears; and in case of doubt every possible presumption not clearly inconsistent with the language and subject matter is to be made in favor of the constitutionality of legislation. Every reasonable presumption or intendment must be indulged in favor of the validity of an act and it is only when invalidity appears so clearly as to leave no room for reasonable doubt that it violates some provision of the Constitution, that a court will refuse to sustain its validity. A statute is presumed to be constitutional and it will not be declared unconstitutional unless clearly so, or so beyond a reasonable doubt.

*City of Ann Arbor, Mich. v. Northwest Park Construction Corp.*, 280 F.2d 212, 223 (6th Cir. 1980) (internal citations omitted). Similarly, acts of the Tennessee General Assembly are presumed valid under Tennessee law and Tennessee courts must "indulge in every presumption and resolve every doubt in favor of the constitutionality of the statute." *Petition of Burson*, 909 S.W.2d 768, 775 (Tenn. 1995). *See also, Vogel v. Wells Fargo Guard Services*, 937 S.W.2d 856, 858 (Tenn. 1996).

Plaintiffs assert that Tenn. Code Ann. § 2-1-104(a)(30) violates their rights to associate, to cast their votes effectively and to express their own views in violation of the First Amendment because it requires petitions for obtaining recognition as a statewide political party to be signed by registered voters as members of the party. The United States Supreme Court has outlined the court's function in evaluating a constitutional challenge to a State's election law:

> It must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests, it also must consider the extent to which those interests make it necessary to burden the plaintiffs' rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional

*Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983).

The Supreme Court has further recognized that state statutes that restrict "the access of political parties to the ballot impinge upon the rights of individuals to associate for political purposes, as well as the rights of qualified voters to cast their votes effectively." *Rainbow Coalition of Oklahoma v. Oklahoma State Election Board*, 844 F.2d 740, 743 (10th Cir. 1988) (quoting *Munro v. Socialist Workers Party*, 479 U.S. 189, 193 (1986).

However, the right to associate for political purposes through ballot and vote are by no means absolute. *Burdick v. Takushi*, 504 U.S. 428, 433 (1992). Rather, "[c]ommon sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections." *Id.* Thus, it is beyond cavil that states have an interest in ensuring fair and orderly elections, and maintaining the integrity of the ballot through reasonable restrictions. *See* U.S. Const. Art. I, § 4, cl. 1 (states shall prescribe the time, place and manner of holding

21

elections); *Storer v. Brown*, 415 U.S. 724, 730 (1974) ("[A]s a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes."). Furthermore, the Supreme Court has held that a state has an important interest in requiring "a significant modicum of support before printing the name of a political organization's candidate on the ballot – the interest, if no other, in avoiding confusion, deception, and even frustration of the democratic process at the general election." *Rainbow Coalition,* 844 F.2d at 743.

Restrictions that do not affect a political party's ability to perform its primary functions of organizing, developing, or recruiting supporters, choosing a candidate, or voting for that candidate in a general election have been held not to impose a severe burden. *See Timmons v. Twin Cities Area New Party*, 520 U.S. 351 (1997) (laws which prohibited an individual from appearing on the ballot as the candidate for more than one party are valid); *Burdick v. Takushi*, (an election system which prohibits write-in candidates is valid); *Clingman v. Beaver*, 544 U.S. 581 (1992) (state's semi-closed primary system that only allows registered members of party and registered independents to vote in primary election is valid).

Here, Tenn. Code Ann. § 2-10-104(a)(30)(B) does not regulate or restrict the Plaintiff parties' internal processes, their authority to exclude unwanted members, their capacity to communicate with the public, their ability to associate with non-members, their ability to nominate their candidates, or their ability to engage in the same activities as every other political organization in the state. It does, however, restrict an organization's ability to obtain recognition as a statewide political party and thereby appear on the general election ballot. Accordingly, this Court should examine the factual evidence as to the actual impact this restriction has on the Plaintiffs rights and the election process.

22

Here, Plaintiffs have not presented any evidence that the requirement in Tenn. Code Ann. § 2-1-104(a)(30)(B) that the petition be signed "by registered voters as members of the party" has actually burdened their First and Fourteenth Amendment rights. Moreover, Plaintiffs LPT and GPT cannot present any evidence of such burden because they have never attempted to obtain recognition as a statewide political party through the petition process set forth in Tenn. Code Ann. § 2-1-104(a)(30)(B).[18] *See Libertarian Party of New Mexico v. Herrera*, 506 F.3d 1303, 1310 (10th Cir. 2007) (where candidates did not attempt to obtain signatures they cannot present evidence as to burdens state law requirements placed on them); *Libertarian Party of Florida v. Florida*, 710 F.2d 790, 794 (11th Cir. 1983) (where plaintiffs did not even attempt to undertake petition drive, because in their view signature requirement was impossible to meet, they failed to present factual evidence that they were precluded from obtaining ballot status by challenged regulations and could not rely upon conclusory allegations, citing *American Party of Texas v. White*, 415 U.S. 767, 781 (1974)).

With respect to Plaintiff CPT – the only Plaintiff to have attempted attempted to obtain statewide recognition through the petition process – it is undisputed that the petition approved by the State Division of Elections and circulated by the CPT did not contain any requirement on its face that a person signing the petition must be a member of the CPT. *See* Exhibit 2 to Castle Deposition. It is further undisputed that the CPT, in obtaining signatures on this petition, did not inquire as to whether the person signing the petition was a member of their party. *See* Exhibit G, Responses No. 8 and 12(f). Accordingly, Plaintiff CPT also cannot demonstrate that the membership requirement contained in Tenn. Code Ann. § 2-10-104(a)(30)(B) unconstitutionally burdened it in pursuing statewide recognition through the petition process.

---

[18] Moreover, the evidence in the record would suggest that, in discussing whether to pursue recognition through the petition process, the GPT did not even discuss, much less consider this "membership" requirement to be an issue. *See* Exhibits 2, 6 and 7 to Culver Deposition.

23

Because Plaintiffs cannot present any evidence supporting their claims that the membership requirement of Tenn. Code Ann. § 2-10-104(a)(30)(B) in its application to them is unconstitutionally burdensome, it is anticipated that Plaintiffs will instead attempt to rely upon a number of cases where allegedly similar restrictions have been struck down, *e.g.*, *Anderson v. Mills*, 664 F.2d. 600 (6th Cir. 1981); *Socialist Workers Party v. Hechler*, 890 F.2d 1303 (4th Cir. 1989); *Workers World Party v. Vigil-Giron,* 693 F.Supp. 989 (D. N.M. 1988); *Libertarian Party of Nevada v. Swackhamer*, 638 F.Supp. 565 (D. Nev. 1986); *Libertarian Party of Nebraska v. Beermann*, 598 F.Supp. 57 (D. Neb. 1984); *Libertarian Party of South Dakota v. Kundert*, 579 F.Supp. 735 (D. S.D. 1984); and *North Carolina Socialist Workers Party v. North Carolina State Board of Elections*, 538 F.Supp. 864 (E.D.N.C. 1982). However, all of these cases are clearly distinguishable from the present case.

For example, in a number of these cases the states require voters to register by party andhe restrictions in question were all struck down because they required voters to change their political party affiliations in order to sign the new party petition, thereby giving up their right to vote in the primary of their former political party. *See, e.g., Workers World Party v. Vigil-Giron*, 693 F.Supp. at 991, 994 (New Mexico statute required that the petition be signed by "voters of New Mexico, who declare by their signatures on such petition that they are voters of New Mexico and that they are members of the political party submitting the petition," thus forcing voters to change their party affiliation as a precondition of supporting the Party's access to the ballot and relinquishing their rights to vote in Democratic or Republican primaries.); *Libertarian Party of South Dakota v. Kundert*, 579 F.Supp. at 737 (South Dakota statute required signers to declare at the time of signing the petition that they "intend to nominate candidates for elective office" and, since South Dakota prohibited a person from nominating candidates "of a party of

24

which he is not a member," court found that a person signing a new party petition under the challenged requirement was thereby declaring his intention to register as a member of the new party.); and *Libertarian Party of Nebraska v. Beermann,* 598 F. Supp. at 59 (Nebraska statute mandated that the petition for the formation of a new party include the language: "Further, we the undersigned hereby pledge to support the new party, support its candidates and to change our registration to affiliate with such new party."); *North Carolina Socialist Workers Party v. North Carolina State Board of Elections,* 538 F.Supp. at 866 (North Carolina statute provided that signers of a new party petition thereby "request and direct the county board of elections to change [their] political party affiliation" to the new party immediately upon its certification as a party.); *Libertarian Party of Nevada v. Swackhammer,* 638 F.Supp. at 566, 568 (Nevada statute required that a new party petition be signed by registered voters "declaring that they represent a political party or principle the name of which is stated in the petition, and that they desire to participate and nominate candidates in the primary election," which court found that average voter would understand "to imply a promise to register as a Libertarian if party status would be achieved," and, therefore, infringes upon the voters' rights of association.)

However, Tennessee does not and never has required registration by political party. Furthermore, a voter does not forfeit his or her right to vote in the primary of another political party by signing a new party petition, as Tennessee's election laws do not require a voter to declare his or her party affiliation until at the primary election itself. Specifically, Tenn. Code Ann. § 2-7-115(b)(2) provides that a registered voter is entitled to vote in a primary election if "[a]t the time the voter seeks to vote, the voter declares allegiance to the political party in whose primary the voter seeks to vote and states that the voter intended to affiliate with that party."

25

Thus, the burdens imposed on voters and political parties' rights of association by the restrictions in the cases discussed above simply are not present in this case.[19]

The other two cases are equally distinguishable. In those cases, the petitions involved were petitions nominating independent or minority party candidates and not new party petitions and the statutes required that a person declare that "he desires to vote" for the named candidate. *See Socialist Workers Party v. Hechler*, 890 F.2d 1303, 1308 (4th Cir. 1989) and *Anderson v. Mills*, 664 F.2d 600, 608 (6th Cir. 1981). The courts found that this "desire to vote" provision, forcing individuals to state that they desire to vote for a candidate before they can sign his nominating petition, was a clear infringement of their right to a secret ballot. *Socialist Workers Party*, 890 F.2d at 1309; *Anderson*, 664 F.2d at 609. The courts also found that this provision imposed an unnecessary burden on voting and associational rights in violation of the Equal Protection Clause because it required voters wishing to sign a nominating petition to declare their desire to vote for a specific individual, whereas voters who support other candidates do not have to make such public declaration. 890 F.2d at 1310; 664 F.2d at 609.

The provisions of Tenn. Code Ann. § 2-10-104(a)(30)(b) do not require a voter to declare their desire to vote for a specified individual and, therefore, unlike the "desire to vote" provision in *Socialist Workers Party* and *Anderson*, do not violate a voter's right to a secret ballot. Also, unlike the provisions in these two cases which treated voters who supported independent and minority candidates differently from voters supporting majority candidate, the provisions of Tenn. Code Ann. § 2-10-104(a)(30)(b) apply equally to *any* party seeking recognition as a statewide political party through the petition process. Thus, the burdens imposed on voters and

---

[19] This is particularly true given that the "membership" provision of Tenn. Code Ann. § 2-1-104(a)(30)(B) has never been enforced , and in fact, cannot be enforced as the State Division of Elections neither has the statutory authority nor the actual ability to enforce this provision. *See* Affidavits of Mark Goins and Brook Thompson, Exhibits A and B.

political parties' rights of association by the restrictions in *Socialist Workers Party* and *Anderson* simply are not present in this case.

Indeed, the new party petition requirements under Tennessee law are more similar to what the Supreme Court approved in *Jenness v. Fortson*, 403 U.S. 431 (1971). Like the Georgia elections laws, under Tennessee election laws:

- No restrictions whatever are placed upon the free circulation of nominating petitions;

- a voter may sign a petition even though he has signed others;

- a voter who has signed the petition of a nonparty candidate is free thereafter to participate in a party primary;

- a voter who has signed a new party petition is free thereafter to participate in another party's primary;

- the signer of a petition is not required to state that he intends to vote for that candidates or that party's candidates at the election;

- a person who has previously voted in a party primary is fully eligible to sign a petition; and

- no signature on a nominating or new party petition need be notarized.

*Id*. at 438-39.

Clearly, the "membership" provision of Tenn. Code Ann. § 2-1-104(a)(30)(B) places on a minimal burden on Plaintiffs' 1st and 14th Amendment rights. This is particularly true in light of the fact that none of the Plaintiffs can present actual evidence of any burden that has been imposed, as well as the following undisputed facts:

- None of the three Plaintiff political parties has any formal membership requirements, but rather membership is simply obtained through "self-recognition" (Exhibit D, Wall Deposition at 57-58; Exhibit G, Response No. 14; Exhibit H, Culver Deposition at 47; and Exhibit I, Article III.A.);

- Tennessee election laws do not require voters to register by party (Affidavits of Mark Goins and Brook Thompson, Exhibits A and B);

27

- Tennessee election laws do not require a voter to declare party affiliation unless and until he/she wants to vote in a party primary election (Tenn. Code Ann. § 2-7-115(b)(2)); and

- The "membership" provision in Tenn. Code Ann. § 2-1-104(a)(30)(B) has never been enforced and cannot be enforced by the State Division Elections since the statute only requires that voter registration and not party membership be certified by election officials and since voters are not registered by party. (Affidavits of Mark Goins and Brook Thompson, Exhibits A and B).

Accordingly, Defendants submit that Plaintiffs cannot present any evidence that the "membership" provision of Tenn. Code Ann. § 2-1-104(a)(30)(B) is unconstitutionally burdensome to them and, therefore, there is no genuine issue of material fact for trial as to an essential element of the Plaintiffs' claims and Defendants are entitled to summary judgment in their favor.[20]

### C. The Signature Percentage Requirement of Tenn. Code Ann. § 2-1-104(a)(30)(B) Does Not Violate Plaintiffs' First and Fourteenth Amendment Rights.

Plaintiffs also challenge the two and a half percent (2.5 %) signature requirement of Tenn. Code Ann. § 2-1-104(a)(30), separately and in tandem with the early petition filing deadline, as unconstitutionally burdening their rights to associate, to cast their votes effectively and to express their own views in violation of the First Amendment and Fourteenth Amendment. Specifically, Plaintiffs charge that requiring a prospective party to collect signatures equaling 2.5 % of the vote from the prior gubernatorial election presents too high a threshold for any new party to achieve.

There is no denying, however, that as a general proposition, as much as a five percent (5%) signature requirement has been upheld as constitutional in numerous ballot access challenges. *See, e.g., Am. Party of Texas v. White*, 415 U.S. at 789 ("Demanding signatures

---

[20] If, however, this Court determines that Plaintiffs have met their burden of presenting evidence from which a reasonable factfinder could rule in their favor, then Defendants submit that the appropriate remedy is not to declare the entire statute unconstitutional, but rather to simply sever the "membership" language from Tenn. Code Ann. § 2-1-104(a)(30)(B).

equal in number to 3% or 5% of the vote in the last election is not invalid on its face."); *Storer*, 415 U.S. at 739-40 (5% requirement not facially unconstitutional); *Jenness v. Fortson*, 403 U.S. at 438-39 (upholding Georgia statute requiring signatures of 5% of registered voters before independent candidates could be placed on ballot); *Swanson v. Worley*, 490 F.3d 894, 905 (11th Cir. 2007) (upholding Alabama statute requiring independent candidates obtain signatures of 3% of vote in last gubernatorial election); *Rogers v. Corbett*, 468 F.3d 188, 195 (3rd Cir. 2006) (upholding Pennslyvania statutes requiring candidate of minor political party obtain signatures of 2% of vote in last election); *Cartwright v. Barnes*, 304 F.3d 1138, 1141, 1142 (11th Cir. 2002) (reaffirming constitutionality of Georgia 5% signature requirement); *Rainbow Coalition of Okla. v. Oklahoma State Election Bd.*, 844 F.2d at 741-742, 744 (10th Cir. 1988) (upholding Oklahoma statute requiring signatures of 5% of the number of votes cast in most recent election); *Libertarian Party of Florida v. Florida*, 710 F.2d at 792-95 (upholding Florida statute requiring minor party candidate obtain signatures of 3% of all registered voters to appear on general election ballot); *Block v. Mollis*, 618 F.Supp.2d 142, 150 (D.R.I. 2009) (upholding Rhode Island statute requiring new political party obtain signatures of 5% of vote from prior election).

The Supreme Court has recognized that when candidates list a party affiliation, the voters and the state are entitled to some assurance that particular party designation has some meaning in terms of a "statewide, ongoing organization with distinctive political character." *Storer v. Brown*, 415 U.S. at 745. Requiring a party to meet the 2.5% signature requirement on a state basis helps achieve this goal. Accordingly, in light of the authority cited above, it cannot be said that Tennessee's 2.5% signature requirement intrudes in a significant manner the rights of the Plaintiffs.[21]

---

[21] This is particularly true in light of a number of factors present under Tennessee's elections law that ease the burden of gathering signatures, *i.e.*, (1) no restrictions whatever are placed upon the free circulation of petitions;

Moreover, to the extent that Plaintiffs assert that Tennessee's 2.5% requirement must be stricken as unconstitutionally burdensome because a majority of states protect interests similar to Tennessee' by imposing a lesser requirement, relying upon the expert report of Richard Winger, such argument and/or evidence is irrelevant. As the federal courts have recognized, "[a] court is no more free to impose the legislative judgments of other states on a sister state that it is free to substitute its own judgment for that of the state legislature." *Libertarian Party of Florida v. Florida*, 710 F.2d at 794 (citing *Storer v. Brown*, 415 U.S. at 729-30).[22] Furthermore, the Supreme Court has upheld a broad array of election schemes, and thus, the issue in this case is whether Tennessee's election scheme is constitutional, not whether Tennessee's scheme is the best relative to other states. *See Green v. Morthan*, 155 F.3d 1332, 1339 (11th Cir. 1998) ("There is a range of fees and signatures requirements that are constitutional, and [a state] legislature is free to choose its ballot access requirements from that constitutional spectrum."). Here

(2) voter may sign a petition even though he has signed others; (3) voter who has signed the petition of a nonparty candidate is free thereafter to participate in a party primary; (4) voter who has signed a new party petition is free thereafter to participate in another party's primary; (5) signer of a petition is not required to state that he intends to vote for that party's candidates at the election; (6) voter who has previously voted in party primary is fully eligible to sign a petition; (7) no requirement that signature on petition be notarized; (8) no restrictions on how many signatures may come from specific geographical area with new party petitions; (9) no restrictions on how many signatures can be submitted in an effort to meet the 2.5% requirement and (10) no restrictions on when the petitioning effort can begin. *See Swanson v. Worley*, 490 F.3d at 904; *Libertarian Party of Florida v. Florida*, 710 F.2d at 794; *see also Jenness v. Fortson*, 403 U.S. at 438-39.

[22] To some extent, the expert report of Mr. Winger is contradictory. While Mr. Winger argues that Tennessee has one of the most restrictive ballot access statutes, the Libertarian Party of Oklahoma in challenging Oklahoma's 5% signature requirement for new political party recognition in 2007, specifically argued that Oklahoma's statute had a substantial effect upon its associational rights because "[m]ost other states require a political party to obtain signatures equivalent to 2.5 % or less of the total number of voters." *Libertarian Political Organization of Oklahoma v. Clingman*, 162 P.3d 948, 954 (Ok. Ct. App.), *cert. denied* (2007). Additionally, Mr. Winger's expert opinion that Tennessee's ballot access statutes must be unconstitutionally burdensome on the Plaintiffs First and Fourteenth Amendment rights because no new political party has obtained statewide recognition since 1968 must be considered in light of the fact that the LPT and GPT have never even tried to obtain recognition through the petition process. Additionally, while the CPT did make a singular attempt in 2001, the evidence in the record shows that they were able to collect over 9,000 signatures in a two month time period and then quit – over five months before the filing deadline to obtain recognition for the 2002 elections and almost 2 ½ years before the filing deadline to obtain recognition for the 2004 general election. (Plaintiff Castle testified that, since it only nominated Presidential candidate, the CPT was seeking recognition in time for the *2004* Presidential elections. See Exhibit F, Castle Deposition at 39.)

30

Tennessee's 2.5% signature requirement clearly falls within the range of petition signature requirements for new party ballot access that have been upheld as constitutional.

### D. The Signature Percentage Requirement of Tenn. Code Ann. § 2-1-104(a)(30)(B) Coupled With The Petition Filing Deadline Does Not Violate Plaintiffs' First and Fourteenth Amendment Rights.

While recognizing that the 2.5% signature requirement of Tenn. Code Ann. § 2-1-104(a)(30)(B) standing alone may pass constitutional muster, Plaintiffs contend that this signature requirement, coupled with Tennessee's early filing deadline, unconstitutionally burdens their First Amendment rights. As previously discussed, since both party primary and independent candidates for the office of governor, general assembly member, U.S. Senator and U.S. Representative must qualify by the first Thursday in April, the State Coordinator of Elections requires that the petitions to obtain recognition as a statewide political party be filed at least thirty (30) days before that date, *i.e.*, the first Thursday in March. This is to allow an administrative period for verifying signatures and determining whether the petitions are sufficient to confer statewide political party status on an organization. *See* Affidavits of Mark Goins and Brook Thompson, Exhibit A and B.

Once again, neither the LPT nor the GPT can present any evidence that this filing deadline, as applied to them, has impacted their ability to obtain recognition as a statewide political party and thus, appear on the general election ballot, because neither party has ever made any attempt to obtain such recognition through the petition process. Moreover, it is difficult to see how this filing deadline could impose any sort of burden on the GPT, when their

31

own By-Laws require that nominating conventions for state-wide offices be called at a minimum of *one month* prior to any and all related State of Tennessee candidate filing deadlines. *See* Exhibit I, Article V.C. Thus, under their own rules of proceeding, the GPT's nominees for state-wide offices must already be decided at least one month before other party primary and independent candidates are required to qualify. Additionally, with respect to the CPT, the only evidence in the record demonstrates that in a little over two months, the CPT was able to obtain *over 9,000* signatures by November 2, 2001 – approximately nine (9) months before the primary election and a year before the 2002 general election.[23] Furthermore, the CPT had another five (5) months before the filing deadline within which to collect signatures, and yet the evidence in the record is that the CPT ceased collecting signatures and did not file any more petitions with the State Division of Elections after November 2001. Accordingly, Defendants would submit that the undisputed evidence in the record is that Tennessee's petition filing deadline has had, at best, only minimal impact upon the Plaintiffs' ability to obtain recognition as a statewide political party.[24]

As the evidence in the record does not support Plaintiffs' argument that the 2.5% signature requirement coupled with Tennessee's early filing deadline severely burdens their First Amendment rights, it is anticipated that Plaintiffs will instead attempt to rely upon the Sixth Circuit Court of Appeal's decision in *Libertarian Party of Ohio v. Blackwell*, 462 F.3d 579 (6th

---

[23] That the CPT was able to obtain over 9,000 signatures in a little over two months and more than a year prior the general election is even more significant given that the CPT has only nominated candidates for the office of president, and thus, presumably has even less recognition among Tennessee voters than the LPT and the GPT, both of whom have nominated candidates for state and local office on numerous occasions. *See* Exhibit E, Response No. 5; Exhibit G, Response No. 5 and Exhibit K, Response No. 5.

[24] To the extent Plaintiffs rely upon the "minor" party history in other states as evidence that Tennessee's petition filing deadline coupled with the signature requirement places too severe a burden on such minor party's in Tennessee, such reliance is misplaced. The failure of "minor" parties such as the LPT, CPT and GPT is not likely the result of the challenged signature requirements and filing deadline, but rather voter idealogy, traditional party loyalty to the Republican and Democrat parties, as well as the unchallenged five percent automatic ballot access threshold.

32

Cir. 2006). In that case, the Sixth Circuit found that the combination of Ohio laws that required a political party to nominate its candidate by primary election and to file a registration petition twelve months in advance of the general election in order to appear on that ballot imposed a severe burden on the associational rights of the Libertarian Party in violation of the First Amendment. *Id.* at 595. The situation presented in that case, however, is clearly distinguishable from the present case and thus does not support Plaintiffs' position.

Under Ohio's election laws, all political parties are required to nominate all their candidates, including presidential, at primary elections. By statute, primaries are held the first Tuesday after the first Monday in May, except in presidential election years, when the primaries are held the first Tuesday after the first Monday in March. Ohio further provides two methods by which a party can qualify for the primary election. Any party that, in the preceding state election, receives at least five percent of the vote for its candidate for governor or president automatically qualifies for the next statewide election. All other parties are required to file a petition no later than 120 days prior to the date of the primary election containing signatures equal to one percent of the total vote cast in the previous election.[25] If a party does not file a petition by this date, it cannot participate in the primary election and is thus prevented from appearing on the general election ballot. Thus, to be on the ballot for the *November 2004* presidential elections, political parties either had to meet the 5% automatic qualification provision or file a petition containing the requisite number of signatures no later than *November 3, 2003*. *Id.* at 582-83.

The LPO actually timely filed a petition containing the requisite number of signatures; however, the petition was rejected by the Secretary of State as invalid because it did not include the correct election falsification notice. Furthermore, because this rejection did not occur until

---

[25] For the 2004 election, this number equaled 32,290. *Libertarian Party of Ohio*, 462 F.3d at 583.

33

*after* the filing deadline, the LP was unable to submit another petition and, therefore, was unable to qualify as a political party and participate in either the March 2004 primary election or the November 2004 general election. *Id.* at 583. Accordingly, the LPO filed suit challenging the requirement that all political parties nominate all their candidates at the primary election and the filing deadline requirement. The LPO did not, however, challenge the 5% automatic ballot qualification provision.

The Sixth Circuit first found that evidence in the record demonstrated that Ohio was among the most restrictive, if not the most restrictive, state in granting minor parties access to the ballot. *Id.* at 589. It further found that Ohio's filing deadline in the November preceding the election was the earliest deadline reviewed by a federal court. *Id.* at 591. It then concluded that this filing deadline 364 days ahead of the general election for which the party wished to appear on the ballot, in combination with the requirement that political parties choose their candidates only through a primary election, imposed a severe burden on the associational rights of the LPO in violation of the First Amendment. *Id.* at 595.

It should be noted that the LPO's challenge to the application of these elections laws was limited to presidential years only, and consequently, the Sixth Circuit made no ruling on the laws' application in non-presidential election years. *Id.* at 591, fn. 11. Here, Plaintiffs have made no distinction in their challenge to the application of Tennessee's election laws between presidential and non-presidential election years. However, this distinction is a significant in distinguishing the two case for several reasons.

First, unlike Ohio, Tennessee's election laws do not require that political parties nominate all their candidates at a primary election. In particular, Tennessee does not require that political parties nominate their presidential candidates in a primary election. Rather, Tennessee law

34

specifically provides that "[i]t is the intent of this part that delegate selection comply with the delegate selection rules of the delegate's respective national or state party." Tenn. Code Ann. § 2-13-318. Thus, a political party may choose, but is not required, to participate in Tennessee's Presidential preference primary, which takes place on the first Tuesday in February. *See* Tenn. Code Ann. § 2-13-205.[26]

Second, the fact that the Ohio statutes at issue impacted the ballot access of presidential candidates was of significant importance to the Sixth Circuit in its determination that the restrictions imposed by these statutes unconstitutionally burdened the LPO's First Amendment rights.

> [I]t is important to note that the state's interest in regulating an election cannot trump the national interest in having presidential candidates appear on the ballot in each state. In the context of the presidential election, "state-imposed restrictions implicate a uniquely important national interest." Stricter ballot access requirements imposed by states have an impact beyond their own borders, placing some limits on a state's prerogative to regulate its elections. Moreover, as opposed to state or local elections, the outcome of a presidential election largely will be determined by voters outside a state's borders, reducing the importance of the state's administrative concerns. The combination of restrictions in this case "does more than burden the associational rights of . . . voters and candidates. It places a significant state-imposed restriction on a nationwide electoral process."

*Id.* at 594 (internal citations omitted). Here, the restrictions in question do not impact the ballot access of presidential candidates and, therefore, do not place a state-imposed restriction on the nationwide electoral process. Tennessee has a separate statute governing ballot access for non-statewide party candidates. Specifically, Tenn. Code Ann. § 2-5-208(d)(1)) provides that any non-statewide political party can have its presidential candidate recognized on the ballot as the

---

[26] The deadline for all candidates to qualify for the November presidential election – both party and independent candidates – is the third Thursday in August preceding the November election. *See* Tenn. Code Ann. § 2-5-101(a).

party's candidate in future presidential elections if its presidential candidate received at least five percent (5%) of the votes cast in Tennessee in the last presidential election. Such candidate then is simply required to file a qualifying petition containing 25 signatures of registered voters by the third Thursday in August preceding the November general election. Tenn. Code Ann. § 2-5-101(a)(1) and (b)(1). Plaintiffs have not challenged either of these statutes.

Instead, Plaintiffs have challenged Tennessee's statutes for obtaining recognition as a statewide political party through the petitioning process.[27] However, the Supreme Court has explained the political party's approach to political activity as follows: "A new party organization contemplates a statewide, ongoing organization with distinctive political character. Its goal is typically to gain control of the machinery of state government by electing its candidates to public office." *Storer v. Brown*, 415 U.S. at 745. Accordingly, it has been recognized that a state has a correspondingly greater interest in imposing restrictions on new political party recognition to provide "assurance that the particular party designation has some meaning." *Libertarian Party v. Florida*, 710 F.2d at 795.

Finally, unlike Ohio, Tennessee's petition filing deadline was not established as a matter of administrative convenience, but rather, is mandated by Tennessee's election schedule. Political party candidates for offices on the November general election ballot (other than President) must file their qualifying petitions by the first Thursday in April in order to run in the August primary election. Similarly, independent candidates for those offices must file their qualifying deadlines by that same deadline in order to appear on the November general election ballot. *See* Tenn. Code Ann. § 2-5-101(a)(2). Thus, under Tennessee's election schedule, the

---

[27] As previously noted, Plaintiffs have not challenged the 5% automatic recognition/qualification provision contained in Tenn. Code Ann. § 2-1-104(a)(30)(A).

36

deadline for any candidate (other than presidential) to qualify in order to appear on the November general election ballot is the first Thursday in April.

The requirement that new party petitions be filed at least thirty (30) days prior to this qualifying deadline is necessary to provide enough time for the State Division of Elections (in combination with the local county election commissions) to verify the petitions before this candidate qualifying deadline. The Supreme Court has acknowledged "that some cut off period is necessary . . . to verify the validity of signatures on the petition." *American Party v. White*, 415 U.S. at 787, n. 18. Defendants have presented undisputed evidence that thirty (30) days is necessary for the administrative verification of the petition signatures. *See* Affidavits of Mark Goins and Brook Thompson, Exhibits A and B. Consequently, a later filing deadline, instead of lessening the restriction on Plaintiffs' ability to obtain recognition on the general election ballot – as suggested by the Sixth Circuit in *Libertarian Party v. Blackwell* – would actually increase that restriction and result in the Plaintiff parties being completely precluded from obtaining any recognition on the general election ballot. Put quite simply, a later petition filing deadline will not leave enough time for the administrative verification of signatures and new statewide party recognition before the qualifying deadline. However, statewide party recognition has to occur before the candidate filing deadline; otherwise potential party primary candidates will be unable to file their nominating petitions by the qualifying deadline.

Furthermore, all candidates for offices appearing on the November general election ballot (within the exception of President) are equally burdened by the fact that Tennessee has chosen to have an early qualifying deadline and Plaintiffs have not challenged this deadline, either

separately or in combination with the Tennessee's other election statutes.[28] Plaintiffs have challenged Tenn. Code Ann. § 2-13-202 which requires that political parties must nominate their candidates for the offices of governor, member of the general assembly, U.S. Senate and U.S. Representative in a primary election. However, even if Plaintiffs were allowed to nominate their candidates by some other method, such nomination would still have to occur after a determination of statewide political party status and in time for the nominated candidate to be certified to the state and/or county election commissions by the candidate qualifying deadline.[29] Although the federal Constitution bars states from discriminating against independent and minor party candidates, it does not mandate that states give preferential treatment over major party candidates. To allow newly recognized statewide political parties to certify their party nominees after the date that primary candidates of existing statewide political parties and independent candidates are required to qualify clearly would give such parties preferential treatment – at the expense and to the detriment of the existing statewide party primary candidates and independent candidates.

Thus, unlike the Ohio statutes at issue in *Libertarian Party v. Blackwell*, Tennessee's petition process for statewide party recognition imposes only a reasonable burden on Plaintiffs constitutional rights. Indeed, Tennessee's petition process is more similar to the new party petition process in Oklahoma that was upheld by both the state and federal courts. *See Rainbow Coalition of Oklahoma v. Oklahoma State Election Board*, 844 F.2d 740 (10th Cir. 1988) and *Libertarian Political Organization of Oklahoma v. Clingman*, 162 P.3d 948 (Okla. Ct. App.),

---

[28] Defendants recognize that this qualifying deadline is an early deadline. However, any burden imposed by this deadline is fully offset by the reasonable signature requirements for qualifying petitions contained in Tenn. Code Ann. § 2-5-101(b)(1). *See Lawrence v. Blackwell*, 430 F.3d 368, 375 (6th Cir. 2005).

[29] Indeed, the GPT's By-Laws specifically provide that such nominating convention will occur at least thirty (30) days prior to the candidate qualifying deadline. *See* Exhibit I, Article V. C.

38

*cert. denied* (2007). Like Tennessee, Oklahoma's election scheme distinguishes between those political parties that are recognized by the state and those that are not. Again, like Tennessee, only recognized parties may identify their candidates on the ballot by party label. *Rainbow Coalition*, 844 F.2d at 741.

However, in order to obtain recognized party status, Oklahoma's statutes are actually more stringent that Tennessee's. Oklahoma requires an organization to file a notice of intent with the Oklahoma State Board of Elections, followed by petitions "bearing the signatures of registered voters equal to at least five percent (5%) of the total votes cast in the last General Election either for Governor or for electors for President and Vice President." 26 O.S. Supp. 2006 § 1-108. Tennessee only requires 2.5% of the total votes cast for Governor.[30]

The petitions may be circulated a maximum of one year after the notice is filed and must be filed "no later than May 1 of an even-numbered year." Additionally, the petitions may not be circulated between May 1 and November 15 of any even-numbered year. *Id.* Tennessee places no such temporal restrictions on the circulation of petitions. The State Board of Elections then has 30 days to determine the validity of the signatures. *Id.* Tennessee's election officials also have 30 days to determine the validity of signatures. Declarations of candidacy as the nominee of a party must be filed between the first Monday, Tuesday or Wednesday in June. 26 O.S. Supp. 2006 § 5-110. Thus, like Tennessee, new party petitions in Oklahoma must be filed roughly 30 to 35 days before the statutory deadline for declaring candidacy.

Finally, a recognized party whose nominee for governor or for presidential electors does not receive at least ten percent of the total votes cast in a general election, ceases to be a

---

[30] This difference is significant. For example, in order for an organization to obtain political party recognition in Oklahoma in 2010, 73,133 signatures will be required. However, in Tennessee, only 45,464 signatures are required, which is essentially equal to the number of signatures that were required in Oklahoma in 1988. *Rainbow Coalition*, 844 F.2d at 742.

recognized party and has to go through the petitioning process again in order to be recognized as such. 26 O.S. 2001 § 1-109(A). Tennessee only requires that a party's candidate receive at least five percent of the total votes cast in the last gubernatorial election to retain recognition as a statewide political party. Furthermore, Tennessee allows a political organization the alternate opportunity of obtaining recognition by having a candidate receive five percent of the votes cast in a statewide election. Under Oklahoma's statutes, however, unless a party's candidates appeared on the General Election ballot in 1974, the petitioning process is the only way to obtain recognition. *Rainbow Coalition*, 844 F.2d at 741, n.2.

The Libertarian Party of Oklahoma challenged the Oklahoma's 5% signature requirement and petition filing deadline first in federal court in 1998. With respect to the petition filing deadline, Oklahoma argued that, just like Tennessee's petition filing deadline, the early petition filing deadline was mandated by the Oklahoma election schedule and necessary to provide enough time for verifying the petition signatures before the primary candidate filing period. The 10th Circuit noted that, in the formation of a new political party, it is recognized that states have a greater interest in imposing restrictions to provide "assurance that the particular party designation has some meaning." *Rainbow Coalition*, 844 F.2d at 746 (quoting *Libertarian Party v. Florida*, 710 F.2d at 795). The court then noted that

> [a] petition procedure may not always be a completely precise or satisfactory barometer of actual community support for a political party, but the Constitution has never required the states to do the impossible. Hard work and sacrifice by dedicated volunteers are the lifeblood of any political organization. Constitutional adjudication and common sense are not at war with each other, and we are thus unimpressed with arguments that burdens like those imposed by [the State] are too onerous.

40

*Id.* (citing *American Party*, 415 U.S. at 787). The Tenth Circuit then found that Oklahoma's petition filing deadline was not unconstitutional, even in conjunction with the relatively high signature requirement.[31]

The Oklahoma Court of Appeals affirmed this finding in 2007, holding that Oklahoma's statutes provide "a reasonable, orderly, and efficient means of allowing unrecognized parties access to the general election ballot by demonstrating that they have a modicum of support" and that such restrictions "not only preserve parties as viable and identifiable interest groups, but also discourage 'frivolous' candidates, party raiding and 'sore loser' candidates by spurned contenders. *Libertarian Party v. Clingman*, 162 P.3d at 955 (citing *Clingman v. Beaver*, 544 U.S. at 581. Furthermore, in upholding Oklahoma's signature requirements and petition filing deadline as reasonable and justified by legitimate state interests, the court noted that the Libertarian Party of Oklahoma had presented virtually no evidence indicating how Oklahoma's petition filing deadline operates in tandem with other laws in a manner that was unconstitutionally restrictive. *Id.* at 955-956.

Since the LPT and GPT have never attempted to obtain statewide recognition in Tennessee through the petition process, they also cannot present any evidence indicating how Tennessee's petition filing deadline operates in tandem with the petition signature requirements in a manner that is unconstitutionally restrictive. And, while the CPT did attempt the petition process in 2001, it also cannot present any such evidence, since the undisputed evidence in the record affirmatively demonstrates that the CPT ceased their attempts to collect signatures over five (5) months before the petition filing deadline.

---

[31] The five% signature requirement was summarily upheld in light of the Supreme Court's ruling in *Jenness v. Fortson.*

The undisputed evidence in the record is that Tennessee's petition filing deadline operating in tandem with the 2.5% signature requirement has had, at best, only minimal impact upon the Plaintiffs' ability to obtain recognition as a statewide political party and that Tennessee's petition filing deadline is mandated by its election schedule, and in particular, the candidate qualification deadline which Plaintiffs have not challenged. Furthermore, Tennessee has an important interest, as recognized by the Supreme Court, "in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot – the interest, if no other, in avoiding confusion, deception, and even frustration of the democratic process at the general election", as well as in preserving parties as viable and identifiable interest groups and discouraging frivolous candidates, party raiding and sore loser candidates by spurned contenders. *See Rainbow Coalition*, 844 F.2d at 743 (citing *Munro*, 107 S.Ct. at 537) and *Libertarian Party v. Clingman*, 162 P.3d at 955 (citing *Clingman v. Beaver*, 544 U.S. at 581). In light of this undisputed evidence and authority, Tennessee's 2.5% petition signature requirement and petition filing deadline, operating separately and in tandem with each other, do not unnecessarily restrict or infringe upon the associational rights of Plaintiffs and are reasonable and justified by legitimate state interests. Accordingly, Defendants submit that under the *Anderson* balancing test, they are entitled to a judgment in their favor finding that this petition signature and filing deadline do not violate Plaintiffs' constitutional rights.

## CONCLUSION

For these reasons, Defendants respectfully request that this Court enter summary judgment in their favor upholding the constitutionality of Tennessee's statute governing the procedures for an organization to obtain recognition as a statewide political party.

Respectfully submitted,

ROBERT E. COOPER, JR.
Attorney General and Reporter


/s/ Janet M. Kleinfelter
JANET M. KLEINFELTER (BPR 13889)
Deputy Attorney General
Public Interest Division
Office of Tennessee Attorney General
P.O. Box 20207
Nashville, TN 37202
Janet.kleinfelter@ag.tn.gov

## CERTIFICATE OF SERVICE

The undersigned hereby certifies on the ___15th___ day of January 2010, that a copy of the above document has been served upon the following persons by:

___X___                                Electronic Case Filing (ECF) System to:

JAMES C. LINGER (OBA #5441)
1710 South Boston Avenue
Tulsa, OK 74119-4810
(918) 585-2797
bostonbarristers@tulsacoxmail.com

DARRELL L. CASTLE (BPR 6863)
3100 Walnut Grove, Suite 610
Memphis, TN 38111
(901) 327-2100
Dlc2586@aol.com

/s/ Janet M. Kleinfelter
JANET M. KLEINFELTER

44