IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| LIBERTARIAN PARTY OF TENNESSEE, ANTHONY WALL, GREEN PARTY OF TENNESSEE, KATHLEEN A. CULVER, CONSTITUTION PARTY OF TENNESSEE and JOAN CASTLE,<br><br>Plaintiffs,<br><br>v.<br><br>MARK GOINS, Coordinator of Elections for the State of Tennessee, and TRE HARGETT, Secretary of State for the State of Tennessee,<br><br>Defendants. | Case No. 3:08-0063<br>Judge Haynes |

## DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Defendants, the Coordinator of Elections for the State of Tennessee and the Secretary of State for the State of Tennessee, hereby submit this response in opposition to Plaintiffs' motion for summary judgment pursuant to Fed. R. Civ. P. 56.

### ARGUMENT

Plaintiffs have relied primarily on the report of their expert witness to support their motion for summary judgment, and in particular, the expert's opinion that "[t]he combination of high number of signatures, the requirement that the signers must claim to be members, and the early deadline, are fatal" to any political party successfully obtaining recognition as a statewide

political party through the petition process. While Defendants do not contest Mr. Winger's qualifications as an expert, they do object to his report on the grounds that it does not meet the relevancy and reliability requirements of Fed. Rul. Evid. 702 and *Daubert v. Merrell Dow Pharm. Inc.*, 509 U.S. 579 (1993) ("*Daubert*"). Accordingly, Defendants submit that Mr. Winger's testimony – and in particular the opinion discussed above – should be excluded from consideration by this Court.

Under Federal Rule of Evidence 104(a), this Court must make a threshold determination whether Mr. Winger's opinion should be admitted. As this Court has recognized, "close judicial analysis of such technical and specialized matter is necessary not only because the likelihood of juror misunderstanding, but also because expert witnesses are not necessarily always unbiased scientists. They are paid by one side for their testimony." *Gibson Guitar Corp. v. Paul Reed Smith Guitars, L.P.*, 325 F.Supp.2d 841, 846 (M.D. Tenn. 2004) (quoting *Turpin v. Merrel Dow Pharm., Inc.*, 959 F.2d 1349, 1352-53 (6th Cir. 1992)).

Fed. R. Evid. 702 and *Daubert* guide a determination of the sufficiency of expert testimony. Rule 702 states:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experiences, training or education, may testify thereto in the form of an opinion or otherwise, *if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.* (emphasis added).

The Supreme Court in *Daubert* imposed a gatekeeping function on the district courts to ensure that expert testimony was based on scientific knowledge and in compliance with Rule 702. 509 U.S. at 597. *Daubert* requires that "[i]n order to qualify as 'scientific knowledge,' an inference

2

or assertion must be derived by the scientific method, *i.e.*, ' a grounding in the methods and procedures of science [that] connotate more than subjective belief or unsupported speculation' and that 'apply to any body of known facts or to any body of ideas inferred from such facts or accepted as truth on good grounds.'" *Id.* at 590. In short, the requirement that an expert's testimony pertain to "scientific knowledge" ensures that such expert opinion is both relevant and reliable. *Id.* at 597. The Supreme Court has since expanded the district court's gate-keeping function under Rule 702 to all expert testimony, including persons with specialized knowledge. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999).

The relevancy inquiry under Rule 702 focuses on the "fit" or "whether expert testimony proffered in the case is sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Daubert*, 509 U.S. at 591; *see also Rondigo, L.L.C. v. Casco Township, Michigan*, 537 F.Supp.2d 891, 892 (E.D. Mich. 2008) ("The relevant inquiry ensures 'that there is a fit between the testimony and the issue to be resolved by the trial.'") (citing *Greenwell v. Boatwright*, 184 F.3d 492, 496 (6th Cir. 1999)).

The reliability inquiry focuses on the methodology and principles that form the basis for the expert's testimony. *Greenwell v. Boatwright*, 184 F.3d at 497. *Daubert* sets forth four "criteria that might assist trial courts in making a preliminary evaluation of expert testimony before admitting it." *Gross v. Comm'r*, 272 F.3d 333, 339 (6th Cir. 2001); *Smelser v. Norfolk S. Ry. Co.*, 105 F.3d 299, 303 (6th Cir. 1997). These criteria are:

1. Whether the theory or technique can be and has been tested;

2. Whether the theory or technique has been subjected to peer review and publication;

3. The known or potential rate of error; and

   4. Whether the technique has been accepted by the 'relevant scientific community,' or 'has been able to attract only minimal support within the community.'

*Daubert*, 509 U.S. at 593-94.

However, the *Daubert* criteria do not constitute a "definitive checklist or test" and "may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony. *Id*. Indeed, the Sixth Circuit holds that the *Daubert* factors "are not dispositive in every case and should be applied only "where they are reasonable measures of the reliability of expert testimony." *Gross v. Comm'r*, 272 F.3d at 339.

Moreover, this Court has noted that there are additional questions and factors that can be asked on evaluating expert testimony:

> (5) Are the underlying data untrustworthy for hearsay or other reasons? (6) Does the underlying data exclude other causes to a reasonable confidence level? (7) What do the leading professional societies say about this speciality or this type of testimony? (8) How much of the technique is based on the subjective analysis or interpretation of the alleged "expert"? (9) The judge's experience and common sense.

*Gibson Guitar Corp. v. Paul Reed Smith Guitars, L.P.*, 325 F.Supp.2d at 847 (quoting *Hein v. Merck & Co.*, 868 F.Supp. 230, 231 (M.D.Tenn. 1994)). And, yet another factor recognized by this Court is whether the expert's opinion is a product of independent research or whether the opinion was formulated for the litigation. *Id*. (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1317 (9th Cir.), *cert. denied*, 516 U.S. 869 (1995)).

When evaluating expert testimony, "[t]he focus . . . must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595. At the same time:

> [C]onclusions and methodology are not entirely distinct from one another. Trained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules

4

> of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.

*GE v. Joiner*, 522 U.S. 136, 146 (1997) (citing *Turpin v. Merrell Dow Pharm., Inc.*, 959 F.2d 1349, 1360 (6th Cir. 1992), *cert. denied*, 506 U.S. 826 (1992)).

Furthermore, general acceptance of the methodology is not enough to satisfy the requirements of *Daubert* and Rule 702. An expert's opinion must: (1) be based upon sufficient facts or data, (2) be the product of reliable principles and methods; and (3) apply the principles and methods reliably to the facts of the case. In other words, the opinion must be based on sufficient facts so as to "draw a [reasonable] conclusion regarding the particular matter to which the expert testimony was directly relevant." *Kumho*, 526 U.S. at 154.

**Relevancy**

Here, Mr. Winger's expert testimony meets neither the relevancy nor the reliability test. With respect to relevancy, there simply is no "fit", *i.e.*, Mr. Winger's expert testimony is not sufficiently tied to the facts of the case so as to aid in determination of the issues in this case. The issue in this case is whether Tennessee's statutes governing the process for a political party to obtain recognition as a statewide political party – *as applied to the Plaintiffs*, the Libertarian Party of Tennessee, the Constitutional Party of Tennessee and the Green Party of Tennessee – unconstitutionally burdens their First Amendment rights.

Mr. Winger's expert opinion is that "it would be impossible, or virtually impossible, for any group to successfully use the petition procedure to qualify a new party" based upon the "combination of the high number of signatures, the requirement that the signers must claim to be members, and the early deadline" as demonstrated by the historical record. However, the only facts or data that Mr. Winger relies upon in arriving at this conclusion are that: (1) only one

party has obtained recognition as a statewide political party since the petition requirements were adopted by the Tennessee General Assembly in 1961 and (2) several minor parties have been unsuccessful in collecting a sufficient number of signatures.

Mr Winger ignores, however, the fact that the Plaintiff Libertarian Party of Tennessee ("LPT") has never once – in its thirty-nine (39) years of existence in Tennessee – attempted to obtain recognition as a statewide political party through the petition process. *See* Exhibit D to Defendants' Motion for Summary Judgment at pp. 41-43; Exhibit E to Defendants' Motion for Summary Judgment, Response Nos. 6 and 10. Furthermore, his statements that the Plaintiff Green Party of Tennessee ("GPT") made an attempt in 1993, and that the Plaintiff Constitution Party of Tennessee (CPT) made three separate attempts to obtain recognition as a statewide political party, are directly contradicted by these very parties. *See* Exhibit G to Defendants' Motion for Summary Judgment, Response Nos. 6 and 10; Exhibit K to Defendants' Motion for Summary Judgment, Response Nos. 6 and 10.

Mr. Winger's expert opinion further ignores the fact that the "membership requirement" (*i.e.,* the requirement that signers of the petition must claim to be members of the party) was not followed by the CPT, when it conducted its petition drive in 2001. He also ignores the fact that this "membership requirement" has never been required or enforced by the State – and in fact – cannot be enforced because the State does not register voters by party membership or affiliation. Consequently, the only evidence in the record concerning the "membership requirement" is that – either separately or in tandem with the 2.5% signature requirement – it has had no effect whatsoever on any of the Plaintiffs in their attempts to obtain recognition through the petition process.[1] Accordingly, there is simply too great an analytical gap between Mr. Winger's opinion

---

[1] In fact, Mr. Winger's expert report and amended report are completely silent about the membership requirement with the exception of the singular reference contained in his opinion, that this requirement, along with

6

and the data in his report and the evidence in the record to make his opinion concerning the membership requirement admissible under Rule 702 and *Daubert*.

Similarly, there is too great an analytical gap between Mr. Winger's opinion and the data concerning the filing deadline. Once again, Mr. Winger's expert report makes no mention of the filing deadline having any effect on the attempts (or lack thereof) by the Plaintiff parties (LPT, CPT and GPT) to obtain recognition as statewide political parties. Indeed, the only reference Mr. Winger makes to the filing deadline having any effect is a statement that another political party tried to obtain recognition in 1995-1996, and had 13,000 signatures by April, 1996, "but since petitions seemed to be due in April and the requirement was 37,179, that drive failed." He provides no information, however, as to when this party began its petition drive and what sort of efforts it took to collect signatures. This singular statement is simply not sufficient to support Mr. Winger's conclusion that the filing deadline has made it impossible for political parties to obtain recognition as a statewide political party in this state.

Moreover, Mr. Winger's expert report completely ignores the contrary evidence in the record concerning the petition efforts of the Plaintiff CPT in 2001. The undisputed evidence in the record is that in September 2001, the CPT began collecting signatures on a petition (that did not contain a requirement that the person sign as a member of the CPT) and that by November, they had submitted over nine thousand (9,000) signatures to the State Division of Elections for review. The undisputed evidence in the record further reflects that the CPT did not submit any further signatures to the Division after that time – even though the filing deadline was not for another five (5) months. *See* Exhibit C to Defendants' Motion for Summary Judgment; Exhibit F

---

the high number of signatures and early filing deadline, is fatal to any attempt to obtain recognition through the petition process. More specifically, in Mr. Winger's Opinion No. 3 where he discusses the attempts made by various parties to collect signatures, there is no discussion of whether those parties attempted to comply with the membership requirement in obtaining signatures – there simply is no mention of the membership requirement whatsoever.

7

to Defendants' Motion for Summary Judgment at pp. 39-40, 61; and Exhibit G, Response Nos.6, 8 and 12. Thus, for whatever reason the CPT stopped collecting signatures after November 2001, it clearly was not due to the filing deadline.

Finally, Mr. Winger's report ignores the fact that the GPT's own By-Laws require that nominating conventions for state-wide offices be called at a minimum of *one month* prior to any and all related State of Tennessee candidate filing deadlines – which is the same deadline for filing the petitions to obtain recognition as a statewide political party. *See* Exhibit I to Defendants' Motion for Summary Judgment, Article V.C. As such, there is simply no basis to suggest that this filing deadline impermissibly burdens the GPT's rights under the First Amendment, not when their own organizational rules require them to be sufficiently organized so as to be able to nominate their candidates by that same deadline.

Accordingly, given the dearth of data in Mr. Winger's report concerning the filing deadline as applied to the Plaintiffs (or even any of the political parties that have conducted petition signature drives) and the contrary evidence in the record, it is apparent that Mr. Winger's opinion evidence "is connected to existing data only by the *ipse dixit* of the expert." *GE v. Joiner*, 522 U.S. at 146. As such, Mr. Winger's expert report fails to meet the relevancy requirements of Rule 702 and *Daubert* and, therefore, should not be considered.

### Reliability

Mr. Winger's expert report also fails to meet the reliability requirements of Rule 702 and *Daubert*. As previously discussed, the reliability inquiry focuses on the methodology and principles that form the basis for the expert's testimony. *Greenwell v. Boatwright*, 184 F.3d at 497. Here, Mr. Winger's report fails to identify any "methodology or principles that form the basis" of his testimony, other than to state that his report is "based on my own personal

8

knowledge and research that I have conducted." Consequently, application of the *Daubert* criteria to the expert report would not be helpful in this case as such criteria would not be "reasonable measures of the reliability of expert testimony." *Gross v. Comm'r*, 272 F.3d at 339.

However, an evaluation of the expert testimony under the additional factors previously identified by this Court in the *Gibson Guitar* case demonstrates that such testimony fails to meet the reliability standards. One such factor is whether the underlying data are untrustworthy for hearsay or other reasons. Here, as discussed in the previous section, there is actually very little data in the report supporting Mr. Winger's opinion that the combination of the petition signature requirement, membership requirement and filing deadline make it impossible for a political party to obtain recognition as a statewide political party through the petition process. Moreover, with respect to what data there is, *i.e.*, the petition drives by a couple of political parties, the report fails to identify the source of this data other than to state that Mr. Winger is "aware of these attempts because my newsletter, *Ballot Access News*, has tracked petitions circulated by minor parties to get on state ballots, ever since 1987." Mr. Winger does not identify how his newsletter has tracked the petitions, what information was provided to him or who provided the information. In any event, it would appear that Mr. Winger's knowledge or awareness of these information is based on hearsay. Moreover, the reliability of this information is certainly questionable, as the information concerning the petition drives of the Plaintiff Green Party and Plaintiff Constitution Party is contradicted by their own testimony.

Another factor this Court has recognized is whether the underlying data exclude other causes to a reasonable confidence level. Here, the expert report and underlying data make no attempt to exclude other causes for the fact that the Plaintiffs have not been successful in obtaining recognition as a statewide political party through the petition process. Indeed, one

9

prime cause why the Plaintiff Libertarian and Green Parties have never obtained recognition is because they have never made any attempt to conduct a petition drive – a fact completely ignored by Plaintiffs' expert report.[2]

The underlying data also fails to exclude another significant cause or reason for the Plaintiffs' failure to obtain recognition as statewide political parties and that is, quite simply, a lack of appeal to the electorate and traditional party loyalty to the Republican and Democratic parties. Indeed, the lack of appeal to the electorate is evidenced by the fact that no presidential candidate of any of the three parties has ever received significant voting percentages. For example, the highest percentage that a Green Party presidential candidate has received was in 2000 and was only .95% of the total vote. It's most recent presidential candidate in 2008 received just .10% of the total vote. *See* Exhibit L to Defendants' Motion for Summary Judgment, Response No. 5.[3] Similarly, the highest percentage that a Libertarian Party presidential candidates has received was .44% in 1980, and its presidential candidate in the 2008 election received .33% of the total vote. *See* Plaintiff Libertarian Party of Tennessee's Supplemental Response to Defendants' First Set of Interrogatories and Request for Production of Documents, Response No. 5, attached hereto as Exhibit A and incorporated herein by this reference.[4] Finally, the highest percentage that a Constitution Party presidential candidate has ever received was .32% in 2008. *See* Plaintiff Constitution Party of Tennessee's Supplemental

---

[2] Moreover, to the extent that Plaintiffs assert that they did not undertake a petition drive because in their view the 2.5% signature requirement was impossible to meet, such assertion is not sufficient to demonstrate that they were precluded from obtaining statewide party recognition by the challenged regulations. The Supreme Court has held that factual evidence of such preclusion – not conclusory allegations – must be presented. *See Libertarian Party of Florida v. Florida*, 710 F.2d 790, 794 (11th Cir. 1983) (citing *American Party of Texas v. White*, 415 U.S. 767, 781 (1974)).

[3] In fact, the highest percentage a Green Party candidate has received in a statewide election was 1.34% in 2000. *Id.*

[4] The .44% received by the Libertarian presidential candidate in 1980 is also the highest percentage that a Libertarian candidate has ever received in a statewide election. *Id.*

Response to Defendants' First Set of Interrogatories and Request for Production of Documents, Response No. 5, attached hereto as Exhibit B and incorporated herein by this reference.[5] Thus, as this evidence demonstrates, Plaintiffs' failure to obtain recognition as statewide political parties can clearly be explained by their failure to present candidates and a platform that captured the interest of prospective voters – a cause or explanation never even discussed in Plaintiffs' expert report.[6]

A third factor recognized by this Court is "[H]ow much of the technique is based on the subjective analysis or interpretation of the alleged 'expert'?" *Gibson Guitar*, 325 F.Supp. 2d at 847. Once again, because Plaintiffs' expert report contains no discussion as to the methodology or principles that form the basis of the expert opinion, it is difficult to apply this factor to the expert report. It would appear, however, that any such technique is certainly based on the "subjective analysis or interpretation" of Plaintiffs' expert, as demonstrated by the lack of any data in the expert report concerning the effects of the membership requirement and the filing deadline operating in tandem with the 2.5% signature requirement.

A final factor identified by this Court is whether the expert opinion "is a product of independent research or whether the opinion was formulated for the litigation." While Defendants do not dispute that Mr. Winger may stay informed as to ballot access issues as a result of his newsletter, *Ballot Access News*, it is readily apparent that his expert report was formulated solely for the purpose of this litigation, as evidenced by the fact that his report either

---

[5] The .32% received by the Constitution presidential candidate in 2008 is also the highest percentage that a Constitution candidate has ever received in a statewide election. *Id*.

[6] In his expert report, Mr. Winger states that "[m]inor parties place nominees on the ballot so that they have a voice for their ideas. The minor parties hope to attract voters who will in turn join the party, or at least take an interest in it. Minor party candidates are severely handicapped when they do not have their party label printed on the ballot next to their names." However, the evidence in the record is that when the Libertarian, Constitution and Green Parties were allowed to have their party label printed on the ballot next to the names of their presidential candidates in 2000, their candidates only received .33%, .32% and .10% of the total vote (*i.e.*, less than 1% combined of the total vote cast). *See* Exhibit L to Defendants' Motion for Summary Judgment and Exhibits A and B to this Reply.

11

ignores or fails to take into account the specific facts concerning the attempts – or lack thereof – of the Plaintiffs in this case to obtain recognition as statewide political parties through the petition process.

Instead, Mr. Winger's report relies heavily upon the "historical precedent" that no "minor" political parties have appeared on the November general election ballot in Tennessee since 1972. This failure of "minor" political parties to appear on the ballot he attributes directly to the "high number of signatures, the requirements that the signers must claim to be members, and the early deadline." However, the reliability of this opinion is clearly compromised by the fact that the American Party was able to obtain recognition as a statewide political party in 1968 and 1972 at a time when the law was even more stringent. Specifically, in 1968 and 1972, the law required a party to have either polled *ten percent (10%)* in the last election or submit a petition containing signatures of registered voters equal to *five percent (5%)* of the total vote cast in the most recent gubernatorial election. *See* Plaintiffs' Statement of Undisputed Facts, Statement No. 6. Moreover, the law contained the same requirement that the petition be signed by registered voters "as members of the party." *See* Public Acts of 1961, Chap. 103. The Tennessee General Assembly subsequently reduced these requirements to 5% and 2.5% respectively in 1972. *See* Tenn. Code Ann. § 2-1-104(a)(30). Thus, the undisputed evidence in the record is that a "minor" political party was able to obtain recognition as a statewide political party at a time when the percentage of signatures required was even greater and the "membership requirement" existed.

Accordingly, in evaluating Plaintiffs' expert report under these factors, Defendants submit that such report also fails to meet the reliability standards required under Rule 702 and *Daubert* and, therefore, should not be considered.

## CONCLUSION

In conclusion, while a realistic assessment of Tennessee's statutory scheme for a political party to obtain recognition as a statewide political party must be made within the context of the cumulative effect of the state's overall election scheme, the Plaintiffs have presented virtually no evidence indicating how these statutes have operated in tandem with other election laws in a manner that is unconstitutionally restrictive or burdensome. Indeed, the evidence in the record affirmatively suggests that the membership requirement and the filing deadline have had no effect on the Plaintiffs' ability to collect signatures and that the Plaintiffs' failure to obtain the required number of signatures is due to a lack of effort and a lack of appeal to the electorate.

As such, the statutes in question raise no barriers to ballot access to reasonably diligent political parties and Plaintiffs have failed to demonstrate that these statutes, as applied to them, outweigh the State's recognized interests in requiring some preliminary showing of a significant modicum of support before printing the name of a political organization's candidate on the ballot and in avoiding confusion, deception, and even frustration of the democratic process at the general election, as well as in preserving parties as viable and identifiable interest groups and discouraging frivolous candidates, party raiding and sore loser candidates by spurned contenders.

Accordingly, Plaintiffs have failed to demonstrate that they are entitled to a judgment in their favor as a matter of law and, therefore, Defendants respectfully request that this Court deny Plaintiffs' motion for summary judgment.

    Respectfully submitted,

    ROBERT E. COOPER, JR.
    Attorney General and Reporter

/s/ Janet M. Kleinfelter
JANET M. KLEINFELTER (BPR 13889)
Deputy Attorney General
Public Interest Division
Office of Tennessee Attorney General
P.O. Box 20207
Nashville, TN 37202
Janet.kleinfelter@ag.tn.gov

## CERTIFICATE OF SERVICE

The undersigned hereby certifies on the __16th__ day of February 2010, that a copy of the above document has been served upon the following persons by:

__X__                                                                             Electronic Case Filing (ECF) System to:

JAMES C. LINGER (OBA #5441)
1710 South Boston Avenue
Tulsa, OK 74119-4810
(918) 585-2797
bostonbarristers@tulsacoxmail.com


DARRELL L. CASTLE (BPR 6863)
3100 Walnut Grove, Suite 610
Memphis, TN 38111
(901) 327-2100
Dlc2586@aol.com

/s/ Janet M. Kleinfelter
JANET M. KLEINFELTER

14