## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| LIBERTARIAN PARTY OF TENNESSEE, ANTHONY WALL, GREEN PARTY OF TENNESSEE, KATHLEEN A. CULVER, CONSTITUTION PARTY OF TENNESSEE, and JOAN CASTLE, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | NO. 3:08-00063 JUDGE HAYNES |
| v. | ) ) | |
| MARK GOINS, Coordinator of Elections for the State of Tennessee, and TRE HARGETT, Secretary of State for the State of Tennessee, | ) ) ) ) | |
| Defendants. | ) ) | |

## M E M O R A N D U M

Plaintiffs, Libertarian Party of Tennessee ("LPT"), Anthony Wall, Green Party of

Tennessee ("GPT"), Kathleen A. Culver, Constitution Party of Tennessee ("CPT"), and Joan

Castle, filed this action under 42 U.S.C. § 1983 against the Defendants: Mark Goins, the

Coordinator of Elections for the State of Tennessee, and Tre Hargett, the Secretary of State for

the State of Tennessee. Plaintiffs are political parties and their members seeking recognition and

ballot access in Tennessee's state and national elections. The gravamen of Plaintiffs' complaint

is that certain provisions of Tennessee's ballot access statutes systematically discriminate against

minor political parties and their members by effectively excluding minor parties from achieving

statewide recognition and ballot access in violation of their First Amendment rights to vote, to

express their political speech and to associate as a political party. Plaintiffs' specific contention

is that given Tennessee's historical experiences with minor political parties and the combined

effects of these statutes' party membership requirement for petition signatures, the requirement

of 2.5% of the total vote in the last gubernatorial election for recognition as a statewide political party and the Defendants' policy setting a deadline for party recognition petitions of 120 days before the primary election, effectively bar minor political parties from ballot access in Tennessee elections. Plaintiffs also assert an equal protection claim under the Fourteenth Amendment that in some provisions for ballot access in Tennessee do not impose the same requirements of Tennessee's Democratic and Republican parties. Plaintiffs seek a declaration to eliminate these statutory requirements and the 120 days deadline, but Plaintiffs did not seek any preliminary injunctive relief, nor did Plaintiffs request an expedited ruling.

Before the Court are Plaintiffs' motion for summary judgment (Docket Entry No. 22) and Defendants' motion for summary judgment (Docket Entry No. 21). The parties have completed discovery in this action.

In their motion for summary judgment, Plaintiffs contend, in sum, that the undisputed facts establish that Tennessee's electoral statutes, specifically Tenn. Code Ann. §§ 2-1-104(a)(14), 2-1-104(a)(29), 2-1-104(a)(30), 2-1-114, 2-13-201(a) and 2-13-202, are unduly burdensome to minor political parties and effectively preclude minor political parties from electoral participation. Plaintiffs' specific challenges are: (1) that Section 2-1-104(a)(30)'s requirement of disclosure of voter signatories' party membership on new political party's petition for ballot access unduly burdens Plaintiffs' and Tennessee voters' First Amendment rights; (2) that Section 2-1-104(a)(29)'s alternative requirement of 2.5% of the total vote in the last gubernatorial election for ballot access violates Plaintiffs' First Amendment rights; (3) that the State's requirement that a new or minor political party file its petition for recognition as a statewide party and ballot access 120 days before the August primary election is unduly burdensome to minor political parties' First Amendment rights; and (4) that the State's

2

recognition of a new political party lasts for only one year effectively precludes minor political parties. Plaintiffs contend that these collective requirements under Tennessee laws on ballot access and State election officials' deadline policy are unduly burdensome and violate their First Amendment rights to vote, the Tennessee voters' rights to vote and the privacy of their political affiliation and Plaintiffs' right to associate as a political party under Supreme Court and Sixth Circuit precedents.

In response, Defendants argue only that the Plaintiffs' expert's statements and opinions about Tennessee's electoral statutes precluding minor party participation, should not be considered by the Court because those opinions are unreliable and irrelevant. In their response, Defendants do not address Plaintiffs' other arguments in their motion for summary judgment.

Yet, in their motion for summary judgment, Defendants contend, in essence: (1) that Plaintiffs LPT and GPT lack standing to challenge the constitutionality of Tennessee's electoral statutes as only CPT has actually sought recognition from State officials; (2) that the "membership" provision of Tennessee's political party registration statute, as applied, does not violate Plaintiffs' First and Fourteenth Amendment rights of association and expression because the Defendants do not enforce those provisions; (3) that the 2.5% requirement for ballot access in Tennessee as a statewide political party is valid under the First Amendment given the State's legitimate interest in viable statewide political organizations with a distinctive political character; (4) that Plaintiffs lack proof that the 120 day deadline adversely impacted them; (5) that to eliminate the statute's requirement of a primary for certain offices gives minor political parties preferential treatment from an otherwise reasonable state regulation; and (6) that the party membership signature requirement, coupled with Tennessee's petition filing deadline, is valid under the First and Fourteenth Amendments.

In response, Plaintiffs argue that LPT and GPT have standing to challenge the constitutionality of the Tennessee electoral statutes. Plaintiffs assert that the Secretary of State's office hindered efforts to collect signatures by refusing to review a minor party's petition for acceptable language until the requisite signatures were submitted. Plaintiffs were, in fact, unable to secure the requisite number of signatures for statewide recognition. In Plaintiffs' view, the Defendants' failure to enforce the necessity of party membership for voters who sign recognition petitions does not save this statute from its constitutional infirmity. In sum, Plaintiffs reiterate that the combined effects of Tennessee's party membership requirement for petition signers, the 2.5% requirement, the 120 filing deadline for new and minor political parties render these Tennessee's election statutes and policy unconstitutional.

As a threshold issue, the Court concludes that Defendants' contention to exclude the affidavit and report of Plaintiffs' expert, Richard Winger, lacks merit. Much of Winger's expert report and affidavit contain historical facts that are reliable and subject to verification. Defendants do not challenge the accuracy of Winger's historical data. Winger's testimony as an expert has been accepted in numerous ballot access actions, as reflected on his curriculum vitae. Significantly, the Sixth Circuit cited similar data presented by Winger in <u>Libertarian Party of Ohio v. Blackwell,</u> 462 F.3d 579, 589 (6th Cir. 2006). Thus, the Court considers Winger's affidavit.

For the reasons set forth below, the Court first concludes that Plaintiffs' motion for summary judgment should be granted. Based upon the applicable law and the undisputed facts, the Court concludes that all Plaintiffs have standing to challenge the statutes at issue here. Second, based upon the undisputed historical facts and controlling precedents, the Court concludes that Section 2-1-104(a)(30) violates Plaintiffs' First Amendment right to vote,

4

Tennessee voters' First Amendment right to privacy of their political affiliation, and Plaintiffs' First Amendment right to associate as a political party. Third, based upon the historical record of Tennessee elections and Supreme Court and Sixth Circuit precedents, the Court concludes that Plaintiffs have demonstrated that these Tennessee's 2.5% requirement in Section 2-1-104(a)(29), coupled with the party membership requirement in Section 2-1-104(a)(30) and the State's 120 day deadline for new political parties, effectively preclude minor political party participation in state and national elections in Tennessee. Accordingly, Defendants' motion for summary judgment should be denied.

### A. Findings of Fact[1]

### 1. Minor Political Parties' Historical Election Experiences[2]

For their contentions, Plaintiffs cite the history of minor parties' participation in national and state elections in Tennessee. In 1889, when state governments started printing ballots, minor political parties appeared on the ballot in every presidential and congressional election year in virtually all states. (Docket Entry No. 36, Defendants' Response to Plaintiffs' Statement of Undisputed Facts at ¶ 3). From 1889 until 1961, any new or minor political parties seeking to be listed on the general election ballot in Tennessee had to nominate candidates by a convention, and notify Tennessee election officials to have their nominees placed on the November election ballot. Id. at ¶ 4. Prior to 1961, minor political parties appeared regularly on the Tennessee

---

[1] Upon a motion for summary judgment, the factual contentions are viewed in the light most favorable to the party opposing the motion for summary judgment. Duchon v. Cajon Co., 791 F.2d 43, 46 (6th Cir. 1986). As will be discussed infra, under Supreme Court holdings, upon the filing of a motion for summary judgment, the opposing party must come forth with sufficient evidence to withstand a motion for a directed verdict, Anderson v. Liberty Lobby, 477 U.S. 242, 247-52 (1986), particularly where there has been an opportunity for discovery. Celotex Corp. v. Catrett, 477 U.S. 317 (1986). Under the applicable law, the Court concludes that there are not any material factual disputes. Thus, this section constitutes findings of fact under Fed. R. Civ. P. 56(d).

[2] The historical record of political parties' participation in elections is relevant in these actions as "[p]ast experience will be a helpful, if not always an unerring, guide." Storer v. Brown, 415 U.S. 724, 742 (1974).

ballot. In 1960, the Tennessee ballot listed four political parties, Democratic, Republican, Constitution, and Prohibition. Id. at ¶¶ 1-2.

In 1961, the Tennessee legislature amended the State's election laws to allow only political parties that had either polled 10 percent in the last election or that submitted a petition signed by 5% of the vote cast in the last election to appear on the Tennessee ballot. Id. at ¶ 5. Since the 1961 amendments, minor political parties appeared on the Tennessee election ballot only during the elections between 1968 and 1972, when George Wallace's American Party qualified. Id. at ¶ 6. In 1972, the Tennessee legislature reduced the five percent petition requirement for ballot access for political parties to 2.5 percent of the total vote in the last election, and the vote cast requirement from 10 percent to 5 percent in the last election. Id. at ¶ 8.

Since 1972, minor political parties made a number of attempts to qualify as statewide political parties in Tennessee without success. Id. at ¶ 9. The Populist Party unsuccessfully tried to obtain political party recognition in Tennessee in 1989-1990. Id. at ¶ 10. GPT sought political party recognition in Tennessee in 1993-1994, but also was unsuccessful. Id. at ¶ 11. The Reform Party's efforts at political party recognition in Tennessee in 1995-1996, 1997-1998, and 1999-2000, were unsuccessful. Id. at ¶ 12. CPT's efforts at political party recognition in Tennessee in 1999-2000, 2001-2002, and 2003-2004 were each unsuccessful. Id. at ¶ 13. In each attempt, the parties acquired several thousand voters' signatures, but these numbers were insufficient for recognition under Tennessee law. Id. at ¶ 14.

In 2000 with the "Fair Ballot Access Act of 2000," the Tennessee legislature authorized ballot access for the 2000 presidential election for candidates who polled 5,000 votes for the presidential candidates in 1996. Qualifying candidates could have their political party's name

printed next to their names on the November 2000 ballot. After the 2000 election, a non-statewide political party's name could be listed next to the name of its presidential candidate, if that party's candidate received at least 5% of the votes in Tennessee's last presidential election. Tenn. Code Ann. 2-5-208(d)(1). In the 2000 presidential election, presidential candidates of the Libertarian, Reform, and Green parties had their respective party name next to their names, but their candidates were still listed on the election ballot under an "independent" heading. (Docket Entry No. 36, Defendants' Response to Plaintiffs' Statement of Undisputed Facts at ¶ 7). Since the 2000 general election, Tennessee and Oklahoma are the only states in which only the Democratic and Republican parties have appeared on the election ballots. Id. at ¶ 15. Tennessee has a population of approximately 6.2 million people and currently has over 3.8 million registered voters. (Docket Entry No. 38, Plaintiffs' Response to Defendants' Statement of Undisputed Facts at ¶ 11).

Other relevant historical facts are that in a March 27, 1984 letter, Tennessee elections officials acknowledged that Tennessee statutes do not provide a specific date for when the new party petition for recognition and ballot access is due.[3] (Docket Entry No. 36, Defendants' Response to Plaintiffs' Statement of Undisputed Facts at ¶ 22; Docket Entry No. 40, Defendants' Response to Plaintiffs' Statement of Additional Material Facts at ¶ 56). In addition, on September 17, 1984, the then Tennessee Attorney General issued his opinion that the statutory requirements for a "statewide political party" under Tenn. Code Ann. § 2-1-104(28)(b) are unconstitutional.[4]

---

[3] Tennessee has never had a recent statute setting the deadline for filing petitions for recognition as a statewide political party and the State Election Coordinator has historically filled the void in providing a deadline. (Docket Entry No. 25-3, Amended Expert Report at 20). All page references are to the page numbers of the document in the Court's electronic filing system.
[4] The last page of this opinion and its reasoning were not provided by the parties, and the Attorney General's office was unable to provide a complete copy for the Court to cite the full rationale for that opinion.

## 2. Minor Political Parties' Current Ballot Access

As to the administration of Tennessee's current system, to obtain recognition as a statewide political party and ballot access in Tennessee, a statewide political party must meet one of the following requirements:

> Within the last four years, have at least one candidate for an office to be elected by voters of the entire state receive at least five percent (5%) of the number of votes cast for all gubernatorial candidates in the most recent election for governor;
>
> or
>
> File with the State Coordinator of Elections a petition signed by registered voters who are members of that political party totalling at least two and a half percent (2½%) of the total number of votes cast for governor in the last election for governor, which achieves statewide political party status for one year.

(Docket Entry No. 38, Plaintiffs' Response to Defendants' Statement of Undisputed Facts at ¶ 2).

A statewide political party must also nominate its candidates for four offices for the primary election: governor, general assembly members, United States Senator and United States Representative. The parties may nominate their candidates for all other offices by any method authorized under the rules of that party or by primary election. Id. at ¶ 3. Those parties' primary candidates for the office of governor, general assembly member, United States Senator and United States Representative also must qualify by the first Thursday in April of the election year. The names of a statewide political party's state executive committee members must be certified to the State Coordinator of Elections at least ninety (90) days before the August primary election.

The State Coordinator of Elections also requires that the petitions to obtain recognition as a statewide political party must be filed at least thirty days before the qualifying deadline for the August state primary, i.e., the first Thursday in March of the election year. Id. at ¶ 7.

According to Tennessee's State Coordinator of Elections, this thirty (30) day period allows State election officials, in conjunction with the pertinent local county election

commission(s), to verify petition signatures and determine the petition's sufficiency to qualify as a statewide political party. (Docket Entry No. 21-1, Affidavit of Mark Goins at 3-5; Docket Entry No. 21-2, Affidavit of Brook Thompson at 3-5). The State Coordinator of Elections reviews and certifies the registration of voters signing the petition, but does not determine if those voters are registered members of that party. Id. at ¶ 17.

A State Division of Elections ("SDE") publication entitled "Procedures for Recognition as a Statewide or Local Political Party in Tennessee" is provided to any individual or organization who inquires about the process for obtaining recognition as a statewide political party. Id. at ¶ 13. This publication does not contain any language that a petition must be signed by members of the party seeking to obtain recognition as a statewide political party. Id. at ¶ 14. In approving the format of a petition, the SDE considers: (1) petition's title; (2) a summary or statement of the purpose of the petition; and (3) whether appropriate space for the signatures of registered voters was provided, including space for the person's signature, for the printing of the person's and complete full address, including the name of the voter's county. Id. at ¶ 15. SDE does not require any certain language for the petition nor does it review the language used, particularly in the summary of the petition. Id.

In 2002, the State Coordinator of Elections made available a sample form petition that does not contain any provision for a person to identify party membership or affiliation on the petition. Id. at ¶ 16. Defendants assert that neither new party petitions nor voters' signatures thereon have been rejected because the voters failed to identify their party membership or affiliation on the petition. (Docket Entry No. 38, Plaintiffs' Response to Defendants' Statement of Undisputed Facts at ¶¶ 18, 19). In registering to vote, Tennessee's election officials have

9

never required that an individual voter to identify the voter's political party affiliation.  Id. at ¶ 12.

Aside from political parties, candidates for any office requiring a primary must file the candidate's nominating petition on the first Thursday in April of the election year.  Id. at ¶ 4.  To qualify as a candidate for any office in the primary election or as an independent in the general election, Tennessee's election laws only require the filing of a nominating petition signed by the candidate and twenty-five (25) or more registered voters who are eligible to vote to fill the office by the qualifying deadline, with the exception of independent presidential candidates.  For independent presidential candidates, Tennessee requires a petition to be signed by the candidate and twenty-five (25) or more registered voters for each elector allocated to Tennessee (i.e., 275 signatures of registered voters).  Tenn. Code Ann. § 2-5-101(b)(1).

### 3. Plaintiffs' Party Recognition and Election Ballot Experiences

#### a. LPT

The national Libertarian Party was established in 1971 and is divided into four geographic regions (Mountain, Delta, Heartland and Valley), with an individual coordinator for each region.  (Docket Entry No. 21-4, Deposition of Anthony Wall at 3).  LPT has had its candidates on election ballots in 14 states. (Docket Entry No. 25-3 at 5).  Since at least 1976, LPT has endorsed a presidential candidate on the ballot in Tennessee, but the ballot listed its candidate as an independent candidate, not LPT's candidate.  (Docket Entry No. 38, Plaintiffs' Response to Defendants' Statement of Undisputed Facts at ¶ 25).  LPT has six to seven county affiliates, several regional affiliates and approximately 1,980 members.  (Docket Entry No. 21-4, Deposition of Anthony Wall at 11).

Membership in the national Libertarian Party or its county or regional affiliate confers membership in the LPT. To participate in the LPT, an individual must be accepted by the delegates at LPT's state convention upon a recommendation of an officer of the party or a regional coordinator. Id. at 9-10. LPT has never had a candidate for a statewide office that received at least five percent (5%) of the votes cast in that election, (Docket Entry No. 38, Plaintiffs' Response to Defendants' Statement of Undisputed Facts at ¶ 29), but has endorsed presidential candidates since 1976. In the 2000 presidential election, Harry Browne, LPT's endorsed candidate, received .2% of the total vote in Tennessee. (Docket Entry No. 21-5, Plaintiff LPT's Interrogatory Responses at ¶ 5). LPT has never sought recognition as a statewide political party through the petition process. (Docket Entry No. 38, Plaintiffs' Response to Defendants' Statement of Undisputed Facts at ¶ 30). LPT deemed Tennessee's requirements prohibitive, but has sought legislative amendments of the state's election laws to promote and facilitate ballot access for new political parties. (Docket Entry No. 40, Defendants' Response to Plaintiffs' Statement of Additional Material Facts at ¶ 61).

### b. CPT

As to CPT, Plaintiffs Joan Castle and Darrell Castle established CPT in 1992. (Docket Entry No. 38, Plaintiffs' Response to Defendants' Statement of Undisputed Facts at ¶ 31). CPT does not have a charter, by-laws, rules, records, formal registration of members, but considers persons on its mailing list to be members of the organization and currently has 631 names on its mailing list. Id. at ¶ 32. CPT does not maintain an office space or paid staff or have regular meetings, but may meet once every four years. Id. at ¶ 33. Since 1992, CPT has endorsed a presidential candidate on the ballot in Tennessee, but as with LPT, its candidate was identified on the ballot not as a CPT candidate, but only as an independent candidate. Id. at ¶ 35. CPT has

11

never had a candidate for a statewide office and thus could not meet the five percent threshold of the number of votes cast for all candidates in the most recent gubernatorial election. Id. at ¶ 38. In mid-August 2001, SDE accepted CPT's petition that did not disclose whether the individuals signing the petition were CPT members. Id. at ¶ 40. CPT does not maintain records of whether the person signing the petition was a CPT member. Id. at ¶ 41. On September 6, 2001, CPT submitted 293 petition pages containing approximately 4200 signatures. Id. at ¶ 42. On November 2, 2001, CPT submitted another 345 petition pages containing approximately 5000 signatures. The SDE does not have any record of any additional petition pages submitted by CPT after November 2, 1001. Id. at ¶ 43.

### c. GPT

GPT was initially established in 1992-1993 and again in 1999-20000 and has by-laws and rules for its nominating convention and Presidential candidate election. Id. at ¶ 46. For nominating conventions, GPT's by-laws require that for statewide offices, nominating conventions must be at a minimum of one month prior to any and all related State candidate filing deadlines. Id. at ¶ 47. GPT membership requires "self-recognition and agreement to the Ten Key Values," and members obtain voting rights by submitting a signed copy of the 10 Key Value pledge form. (Docket Entry No. 21-8, Culver Deposition at 4-5). GPT has an email listserv, newsletters and correspondence with approximately 500 persons. Id. at 6-7.

GPT has never had a candidate for a statewide office that has received at least five percent of the number of votes cast for all candidates in the most recent election for gubernatorial or other statewide office and thus cannot obtain recognition as a statewide political party through that process. (Docket Entry No. 38, Plaintiffs' Response to Defendants' Statement of Undisputed Facts at ¶¶ 53 and 54). In 2000, Ralph Nader, GPT's presidential candidate,

received .95% of all votes. GPT has had two presidential candidates since 2000. (Docket Entry No. 21-11, Plaintiff GPT's Interrogatory Reponses at ¶ 5). Defendants note testimony that GPT has been unable to maintain "a core group together that went from election to election." (Docket Entry No. 21-8, Culver Deposition at 3). Defendants also cite a reference in 2006 that some GPT members expressed their view that GPT could attain 41,329 registered voters to submit for party recognition by 2006. (Docket Entry No. 21-8, Culver Deposition, Exhibit 2 thereto at 9).

After his review of minor political parties' experiences in Tennessee and his study of state ballot access laws and minority political parties' participation in other states, Plaintiffs' expert Richard Winger characterized minor political parties' prospects for success of obtaining recognition as a statewide political party in Tennessee as "impossible, or virtually impossible". (Docket Entry No. 25-3, Amended Expert Report at 7).

### B. Conclusions of Law

In <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242 (1986), the United States Supreme Court explained the nature of a motion for summary judgment:

> Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment 'shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' By its very terms, this standard provides that the mere existence of <u>some</u> alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no <u>genuine</u> issue of <u>material</u> fact.
>
> <u>As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.</u> Factual disputes that are irrelevant or unnecessary will not be counted.

<u>Id.</u> at 247-48 (emphasis in the original and added in part). Earlier the Supreme Court defined a "material fact" for Rule 56 purposes as "[w]here the record taken as a whole could not lead a

rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"

Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citation omitted).

A motion for summary judgment is to be considered after adequate time for discovery.

Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986). Where there has been a reasonable

opportunity for discovery, the party opposing the motion must make an affirmative showing of

the need for additional discovery after the filing of a motion for summary judgment. Emmons v.

McLaughlin, 874 F.2d 351, 355-57 (6th Cir. 1989). But see Routman v. Automatic Data

Processing, Inc., 873 F.2d 970, 971 (6th Cir. 1989).

There is a certain framework in considering a summary judgment motion as to the

required showing of the respective parties as described by the Court in Celotex:

> Of course, a party seeking summary judgment always bears the initial
> responsibility of informing the district court of the basis for its motion, and
> identifying those portions of 'the pleadings, depositions, answers to
> interrogatories, and admissions on file, together with the affidavits, if any,' which
> it believes demonstrate the absence of a genuine issue of material fact. . . . [W]e
> find no express or implied requirement in Rule 56 that the moving party support
> its motion with affidavits or other similar materials negating the opponent's claim.
> 477 U.S. at 323 (emphasis deleted).

As the Court of Appeals explained, "[t]he moving party bears the burden of satisfying

Rule 56(c) standards." Martin v. Kelley, 803 F.2d 236, 239, n. 4 (6th Cir. 1986). The moving

party's burden is to show "clearly and convincingly" the absence of any genuine issues of

material fact. Sims v. Memphis Processors, Inc., 926 F.2d 524, 526 (6th Cir. 1991) (quoting

Kochins v. Linden-Alimak, Inc., 799 F.2d 1128, 1133 (6th Cir. 1986)). "So long as the movant

has met its initial burden of 'demonstrat[ing] the absence of a genuine issue of material fact,' the

nonmoving party then 'must set forth specific facts showing that there is a genuine issue for

trial.'" Emmons, 874 F.2d at 353 (quoting Celotex and Rule 56(e)).

14

Once the moving party meets its initial burden, the Court of Appeals warned that "[t]he respondent must adduce more than a scintilla of evidence to overcome the motion [and]. . . must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989) (citations omitted). See also Hutt v. Gibson Fiber Glass Products, 914 F.2d 790, 792 (6th Cir. 1990) ("A court deciding a motion for summary judgment must determine 'whether the evidence presents a sufficient disagreement to require a submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.'") (quoting Liberty Lobby).

If both parties make their respective showings, the Court then determines if the material factual dispute is genuine, applying the governing law.

> More important for present purposes, summary judgment will not lie if the dispute about a material fact is 'genuine' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.
>
>        *     *     *
>
> Progressing to the specific issue in this case, we are convinced that the inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits. If the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict-'whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.'

Liberty Lobby, 477 U.S. at 248, 252 (citation omitted and emphasis added).

It is likewise true that:

15

> In ruling on a motion for summary judgment, the court must construe the evidence in its most favorable light in favor of the party opposing the motion and against the movant. Further, the papers supporting the movant are closely scrutinized, whereas the opponent's are indulgently treated.
>
> It has been stated that: "The purpose of the hearing on the motion for such a judgment is not to resolve factual issues. It is to determine whether there is any genuine issue of material fact in dispute. . . ."

Bohn Aluminum & Brass Corp. v. Storm King Corp., 303 F.2d 425, 427 (6th Cir. 1962) (citation omitted). As the Court of Appeals stated, "[a]ll facts and inferences to be drawn therefrom must be read in a light most favorable to the party opposing the motion." Duchon v. Cajon Co., 791 F.2d 43, 46 (6th Cir. 1986) (citation omitted).

In Street, the Court of Appeals discussed the trilogy of leading Supreme Court decisions, and other authorities on summary judgment and synthesized ten rules in the "new era" on summary judgment motions:

1. Complex cases are not necessarily inappropriate for summary judgment.

2. Cases involving state of mind issues are not necessarily appropriate for summary judgment.

3. The movant must meet the initial burden of showing 'the absence of a genuine issue of material fact' as to an essential element of the non-movant's case.

4. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his

5. A court should apply a federal directed verdict standard in ruling on a motion for summary judgment. The inquiry on a summary judgment motion or a directed verdict motion is the same: 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that the party must prevail as a matter of law.'

6. As on federal directed verdict motions, the "scintilla rule" applies, i.e., the respondent must adduce more than a scintilla of evidence to overcome the motion.

7. The substantive law governing the case will determine what issues of fact are material, and any heightened burden of proof required by the substantive law for an element of the respondent's case, such as proof by clear and convincing evidence, must be satisfied by the respondent.

8. The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'

9. The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

10. The trial court has more discretion than in the 'old era' in evaluating the respondent's evidence. The respondent must 'do more than simply show that there is some metaphysical doubt as to the material facts.' Further, '[w]here the record taken as a whole could not lead a rational trier of fact to find' for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is 'implausible.'

Street, 886 F.2d at 1479-80.

The Court has distilled from these collective holdings four issues that are to be addressed upon a motion for summary judgment: (1) has the moving party "clearly and convincingly" established the absence of material facts?; (2) if so, does the plaintiff present sufficient facts to establish all the elements of the asserted claim or defense?; (3) if factual support is presented by the nonmoving party, are those facts sufficiently plausible to support a jury verdict or judgment under the applicable law?; and (4) are there any genuine factual issues with respect to those material facts under the governing law?

### 1. Standing

Defendants first contend that Plaintiffs GPT and LPT lack standing to challenge the statutes at issue here because neither GPT nor LPT sought to comply with Tennessee's petition process.

The threshold requirement for any civil action is a "case or controversy" under Article III of the Constitution asserted by a plaintiff who has standing to raise the issue. In determining whether a "case or controversy" exists and whether the named plaintiff has standing to complain, the Supreme Court stated in Warth v. Seldin, 422 U.S. 490 (1975):

> We hold only that a plaintiff who seeks to challenge exclusionary zoning practices must allege specific, concrete facts demonstrating that the challenged practices harm him, and that he personally would benefit in a tangible way from the court's intervention. Absent the necessary allegations of demonstrable, particularized injury, there can be no confidence of "a real need to exercise the power of judicial review" or that relief can be framed "no broader than required by the precise facts to which the court's ruling would be applied."
>
> * * *
>
> The rules of standing, whether as aspects of the Art. III case-or-controversy requirement or as reflections of prudential considerations defining and limiting the role of the courts, are threshold determinants of the propriety of judicial intervention. It is the responsibility of the complainant clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers.

Id. at 508 (citation and footnote omitted and emphasis added); accord County of Riverside v. McLaughlin, 500 U.S. 44, 51 (1991) ("At the core of the standing doctrine is the requirement that `a plaintiff [must] allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief.'") (quoting Allen v. Wright, 468 U.S. 737, 751 (1984)).

This "threat of injury" must be both "real and immediate" not "conjectural" or "hypothetical." City of Los Angeles v. Lyons, 461 U.S. 95, 102 (1983). As a general rule, standing should be determined as a preliminary matter through an examination of the facts at the time of the motion. Haskell v. Washington, 864 F.2d 1266, 1276 (6th Cir. 1988). A potential exception may lie where the issues of standing and the merits are inextricably intertwined. City of Revere v. Massachusetts Gen. Hosp., 463 U.S. 239 (1983).

The Supreme Court has twice addressed standing in the context of ballot access claims. In Williams v. Rhodes, 393 U.S. 23, 28 (1968), the Supreme Court held that the Socialist Labor Party had standing to challenge Ohio's restrictions on minor party ballot access, including the petition signature requirement, even though the party there had not filed any petition with signatures. In Storer v. Brown, 415 U.S. 724, 738 (1973), the Supreme Court found that independent presidential and vice-presidential candidates had standing to challenge California's ballot access not withstanding their failure to file any petition with signatures seeking ballot recognition. See also Stevenson v. State Board of Elections, 794 F.2d 1176 (7th Cir. 1986) (independent presidential candidate has standing to challenge Illinois' early filing deadline without showing submissions of petition with signatures); Rainbow Coalition of Oklahoma v. Oklahoma State Election Board, 844 F.2d 740 (10th Cir. 1988) (minority parties who contested Oklahoma's petition requirements and filing deadline for third parties had standing despite their lack of compliance with statutes). In this Circuit, an affiliate of LPT that presented evidence that a state's ballot access requirements were impossible to meet, was held to possess standing to challenge the state statutes at issue. Libertarian Party of Kentucky v. Ehrler, 776 F. Supp. 1200, 1203 (E.D. Ky. 1991).

Applying these precedents to the undisputed facts here, the Court concludes that all Plaintiffs have standing to challenge these election statutes. As discussed infra, Plaintiffs' proof is that Tennessee's 2.5% requirement is a high threshold that minor political parties in Tennessee find unlikely, if not impossible, to achieve. Thus, despite the lack of a filed petition, the Court concludes that GPT and LPT have standing to challenge the statutes at issue here.

## 2. Plaintiffs' First Amendment Claims

Plaintiffs challenge several Tennessee election statutes as violating their First Amendment right to vote and to associate as political parties. The statutes at issue provide as follows:

Tenn. Code Ann. § 2-1-104(a)(14)

(a) In this title, unless a different meaning is clearly intended:
(14) "Political party" means an organization which nominates candidates for public office;

\* \* \*

Tenn. Code Ann. § 2-1-104(a)(29)

(a) In this title, unless a different meaning is clearly intended:

(29) "Statewide political party" means either:

(A) A political party at least one (1) of whose candidates for an office to be elected by voters of the entire state in the past four (4) calendar years has received **a number of votes equal to at least five percent (5%) of the total number of votes cast for gubernatorial candidates in the most recent election of governor; or**

(B) **For one (1) year after petitioning successfully, a political party which has a membership equal to at least two and one-half percent (2.5%) of the total number of votes cast for gubernatorial candidates in the most recent election of governor as shown by petitions to establish a political party filed with the coordinator of elections and signed by registered voters as members of the party** and certified as to registration of the signers by the county election commissions of the counties where the signers are residents.

\* \* \*

Tenn. Code Ann. § 2-1-107

(a) Any person signing a petition required under this title, whether for nomination of a candidate, for a referendum or for any other purpose, shall include the address of such person's residence. The signer of a petition must include the address of such person's residence as shown on such person's voter registration card in order for that person's signature to be counted; provided, that if the address shown on the petition is within the precinct in which the person is

20

registered but is not the address shown on the registration card, the signature shall be valid and shall be counted. In the event that the signer of a petition includes information on a nominating petition that exceeds the information contained on such person's voter registration card, the signature shall be counted if there is no conflict between them. If no street address is shown on the signer's voter registration card, that person's signature and address as shown on such person's voter registration card shall be sufficient. However, a street address shall be sufficient, and no apartment number shall be required.

(b) Any person who signed a permanent registration card shall sign any petition signed under this title; provided, that any person who printed such person's name on such person's permanent registration card shall print the name on any petition signed under this title. However, failure to comply with the foregoing shall not operate to disqualify any nominating signature or candidate's signature.

(c) A person's regular signature shall be accepted just as such person's legal signature would be accepted. For example, for the purposes of this section "Joe Public" shall be accepted just as "Joseph Q. Public" would be accepted.

\* \* \*

Tenn. Code Ann. § 2-1-114

No political party may have nominees on a ballot or exercise any of the rights of political parties under this title until its officers have filed on its behalf with the secretary of state and with the coordinator of elections:

(1) An affidavit under oath that it does not advocate the overthrow of local, state or national government by force or violence and that it is not affiliated with any organization which does advocate such a policy; and

(2) A copy of the rules under which the party and its subdivisions operate. Copies of amendments or additions to the rules shall be filed with the secretary of state and with the coordinator of elections within thirty (30) days after they are adopted and shall be of no effect until ten (10) days after they are filed.

\* \* \*

Tenn. Code Ann. § 2-13-201(a)

**(a) No person's name may be shown on a ballot as the nominee of a political party for the offices named in § 2-13-202 or for any office voted on by the voters of more than one (1) county unless the political party:**

**(1) Is a statewide political party; and**

**(2) Has nominated the person substantially in compliance with this chapter.**

\* \* \*

Tenn. Code Ann. § 2-13-202

Political parties shall nominate their candidates for the following offices by vote
of the members of the party in primary elections at the regular August election:

(1) Governor;
(2) Members of the general assembly;
(3) United States senator; and
(4) Members of the United States house of representatives.

(emphasis added). Plaintiffs assert that the combined effects of these statutes impermissibly

burden their First Amendment rights to free speech, to vote, to associate, and to form a political

organization in Tennessee.

Under the First Amendment, a voter's ability to cast an effective vote "is of the most

fundamental significance under our constitutional structure." Burdick v. Takushi, 504 U.S. 428,

433 (1992). As to formation of a political party, "[r]epresentative democracy in any populous

unit of governance is unimaginable without the ability of citizens to band together in promoting

among the electorate candidates who espouse their political views." California Democratic Party

v. Jones, 530 U.S. 567, 574 (2000); see also Tashjian v. Republican Party of Conn., 479 U.S.

208, 214 (1986) (recognizing as fundamental "[t]he right to associate with the political party of

one's choice"). These rights are intertwined in that "the rights of voters and the rights of

candidates do not lend themselves to neat separation; laws that affect candidates always have at

least some theoretical correlative effect on voters." Anderson v. Celebrezze, 460 U.S. 780, 786

(1983). Additionally, statutes restricting "the access of political parties to the ballot impinge

upon the rights of individuals to associate for political purposes, as well as the rights of qualified

voters to cast their votes effectively." Munro v. Socialist Workers Party, 479 U.S. 189, 193

22

(1986). In <u>Anderson</u>, the Supreme Court emphasized the importance of ballot access and voting rights:

> Our primary concern is with the tendency of ballot access restrictions to "limit the field of candidates from which voters might choose." Therefore, "[i]n approaching candidate restrictions, it is essential to examine in a realistic light the extent and nature of their impact on voters.'"

460 U. S. at 786.

As to the significance of political parties' ballot access, "[t]he right to form a party for the advancement of political goals means little if a party can be kept off the election ballot and thus denied an equal opportunity to win votes. So also, the right to vote is heavily burdened if that vote may be cast only for one of two parties at a time when other parties are clamoring for a place on the ballot." <u>Williams</u>, 393 U.S. at 31. "Competition in ideas and governmental policies is at the core of our electoral process and of the First Amendment freedoms. New parties struggling for their place must have the time and opportunity to organize in order to meet reasonable requirements for ballot position, just as the old parties have had in the past." <u>Id.</u> at 32. "In our political life, third parties are often important channels through which political discourse is aired." <u>Id.</u> at 39 (Douglas, J., concurring). In another decision, the Court stated:

> Any interference with the freedom of a party is simultaneously an interference with the freedom of its adherents. All political ideas cannot be channelled into the programs of our two major political parties. History has amply proved the virtue of political activity by minority, dissident groups, which innumerable times have been in the vanguard of democratic thought and whose programs were ultimately accepted. . . .The absence of such voices would be the symptom of grave illness in our society.

<u>Sweezy v. New Hampshire</u>, 354 U.S. 234, 250-51 (1957) (Warren, C.J.).

More recently, the Sixth Circuit observed that where a "State…is controlled by the political parties in power, '[those parties] presumably have an incentive to shape the rules of the electoral game to their own benefit." <u>Blackwell</u>, 462 F.3d at 587 (quoting <u>Clingman v. Beaver</u>,

544 U.S. 581, 603 (2005) (O'Conner, J., concurring)). "'In short, the primary values protected by the First Amendment . . . are served when election campaigns are not monopolized by the existing political parties." Id. at 589 (quoting Anderson, 460 U.S. at 794).

As to the standards for evaluating Plaintiffs' constitutional challenges to State ballot access laws, "[t]o the degree that a State would thwart this interest by limiting the access of new parties to the ballot, [the Court has] called for the demonstration of a corresponding interest sufficiently weighty to justify the limitation. . . ." Norman v. Reed, 502 U.S. 279, 288-89 (1992). "[I]t is especially difficult for the State to justify a restriction that limits political participation by an identifiable political group." Anderson, 460 U.S. at 793. Yet, "minor barriers between voter and party do not compel strict scrutiny." Burdick, 504 U.S. at 436. In sum, the Supreme Court summarized that the courts:

> must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests, it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights. Only after weighing all these factors is the reviewing court in a position to decide whether the challenged provision is unconstitutional.

Anderson, 460 U.S. at 789.

As the Sixth Circuit observed, "[t]his does not mean . . . that all state restrictions on political parties and elections violate the Constitution" and "states 'may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder.'" Blackwell, 462 F.3d at 585 (6th Cir. 2006) (quoting Timmons v. Twin Cities Area New Party, 520 U.S. 351, 358 (1997)). Moreover, despite the constitutional rights, state voting regulations "are not automatically subjected to heighted scrutiny." Id. at 585. The Sixth

24

Circuit articulated the standard of judicial review as corresponding to the extent of the injuries caused by the cited state law:

> First, the court looks at the "character and magnitude of the asserted injury" to petitioner's constitutional rights. <u>Anderson</u>, 460 U.S. at 789. . . .The court must then "identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule." <u>Id.</u> If petitioner's rights are subjected to "severe" restrictions, "the regulation must be 'narrowly drawn to advance a state interest of compelling importance.'" <u>Burdick v. Takushi</u>, 504 U.S. 428, 434 (quoting <u>Norman v. Reed</u>, 502 U.S. 279, 289 (1992)). But if the state law imposes only "reasonable, nondiscriminatory restrictions" upon the protected rights, then the interests of the state in regulating elections is "generally sufficient to justify" the restrictions. <u>Id.</u> (quoting <u>Anderson</u>, 460 U.S. at 788).
>
> The first step under the <u>Anderson/Burdick</u> framework is to determine whether this burden on the associational rights of political parties is "severe." . . . [T]o accurately apply this test, we must first determine the exact nature of the burden placed upon minor political parties and their voter-supporters.

* * *

> Thus, though the court's role in reviewing election regulations is limited, it is also vital in that it protects interests that may not be adequately represented in the political process.

* * *

> The key factor in determining the level of scrutiny to apply is the importance of the associational right burdened. Restrictions that do not affect a political party's ability to perform its primary functions-organizing and developing, recruiting supporters, choosing a candidate, and voting for that candidate in a general election-have not been held to impose a severe burden.

* * *

> [T]he Supreme Court focus[es] on the degree to which the challenged restrictions operate as a mechanism to exclude certain classes of candidates from the electoral process. The inquiry is whether the challenged restriction unfairly or unnecessarily burdens the availability of political opportunity. <u>Anderson</u>, 460 U.S. at 793 (quoting <u>Clements v. Fashing</u>, 457 U.S. 957, 964 (1982) (plurality opinion)).

<u>Id.</u> at 585, 586, 587, 588, (footnotes omitted).

Case 3:08-cv-00063    Document 43    Filed 09/20/10    Page 25 of 39 PageID #: 594

Significantly, in analyzing the statutes and the alleged burdens on the political parties at issue here, the "inquiry is not whether each law individually creates an impermissible burden but rather whether the combined effect of the applicable election regulations creates an unconstitutional burden on First Amendment rights. Id. at 586 (citing Williams, 393 U.S. at 34). Yet, given the Supreme Court and Sixth Circuit precedents, one of Tennessee's ballot access statutes at issue can be addressed separately.

### a. Tennessee's Party Membership Requirement

Of the Plaintiffs' multiple challenges, the Court addresses first Tennessee's party membership requirement that a voter signatory to the petition for recognition of a minor political party as a statewide political party must be a member of that party.

> (B) For one (1) year after petitioning successfully, a political party which has a membership equal to at least two and one-half percent (2.5%) of the total number of votes cast for gubernatorial candidates in the most recent election of governor as shown by petitions to establish a political party filed with the coordinator of elections **and signed by registered voters as members of the party** and certified as to registration of the signers by the county election commissions of the counties where the signers are residents.

Tenn. Code Ann. § 2-10-104(a)(30)(B) (emphasis added). According to Plaintiffs' expert, among the States, only Tennessee requires voters signing a new political party recognition petition to state that they are members of the political party. (Docket Entry No. 25-3, Amended Expert Report at 5).

The Supreme Court has included in a citizen's First Amendment right to vote, the right to privacy of the voter's political affiliation, particularly for ties to a minor political party. In Brown v. Socialist Workers '74 Campaign Committee (Ohio), 459 U.S. 87 (1982), Ohio required all political parties to file a report disclosing their financial contributors. The Supreme Court held this Ohio statute unconstitutional as applied to the Socialist Workers Party given the history

26

of governmental hostility to that party. Id. at 88, 101-02. In so holding, the Supreme Court reasoned as follows:

> **The Constitution protects against the compelled disclosure of political associations and beliefs. Such disclosures "can seriously infringe on privacy of association and belief guaranteed by the First Amendment."** Buckley v. Valeo, supra, 424 U.S., at 64. . . . "Inviolability of privacy in group association may in many circumstances be indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs." . . . The right to privacy in one's political associations and beliefs will yield only to a "subordinating interest of the State [that is] compelling,". . . and then only if there is a "substantial relation between the information sought and [an] overriding and compelling state interest." Gibson v. Florida Legislative Comm., supra, 372 U.S., at 546.

> In Buckley v. Valeo this Court upheld against a First Amendment challenge the reporting and disclosure requirements imposed on political parties by the Federal Election Campaign Act of 1971. 2 U.S.C. § 431 et seq. (1976). 424 U.S., at 60-7. The Court found three government interests sufficient in general to justify requiring disclosure of information concerning campaign contributions and expenditures: enhancement of voters' knowledge about a candidate's possible allegiances and interests, deterrence of corruption, and the enforcement of contribution limitations. The Court stressed, however, that in certain circumstances the balance of interests requires exempting minor political parties from compelled disclosures. The government's interests in compelling disclosures are "diminished" in the case of minor parties. Id., at 70. Minor party candidates "usually represent definite and publicized viewpoints" well known to the public, and the improbability of their winning reduces the dangers of corruption and vote-buying. Ibid. At the same time, the potential for impairing First Amendment interests is substantially greater:

> **"We are not unmindful that the damage done by disclosure to the associational interests of the minor parties and their members and to supporters of independents could be significant. These movements are less likely to have a sound financial base and thus are more vulnerable to falloffs in contributions. In some instances fears of reprisals may deter contributions to the point where the movement cannot survive. The public interest also suffers if that result comes to pass, for there is a consequent reduction in the free circulation of ideas both within and without the political arena." Id., at 71(footnotes omitted).**

> **We concluded that in some circumstances the diminished government interests furthered by compelling disclosures by minor parties does not justify the greater threat to First Amendment values.**

27

Id. at 87, 91-93 (emphasis added and footnotes omitted).

Earlier, in Anderson v. Mills, 664 F.2d 600 (6th Cir. 1981), the Sixth Circuit held

unconstitutional a Kentucky state law providing that a voter's signature on a petition for a state

candidate's petition for ballot access, was stating the voter's "desire . . . to vote for the

candidate."  In holding this law unconstitutional, the Sixth Circuit reasoned as follows:

> **Although the U.S. Constitution does not specifically guarantee that a person has a right to a secret ballot, such a right has been recognized as one of the fundamental civil liberties of our democracy.  This principle takes on such significance because it safeguards the purity of our election process by eliminating the fear of scorn and ridicule, as well as lessening the evils of violence, intimidation, bribery and other corrupt practices which can be incumbent in non-secret elections.  In order to protect the secrecy of the ballot, many states have enacted constitutional provisions dictating that all ballots must be cast under the cloak of complete privacy.**

> \* \* \*

> Since it is clear that the right to a secret ballot is cherished in our political system, this Court must carefully scrutinize any claim that it is being abridged.  **If the "desire to vote" provision does seriously infringe upon such a right, it cannot survive.**

> \* \* \*

> [T]his provision, as did the lack of partitions and the thin ballots, results in publicizing the way one intends to vote.  Certainly, it can be claimed that the latter two were actual revelations for whom the subscriber voted, while the former is only a declaration of one's desire and intention to vote in a future election.  However, we refuse to adopt such an artificial distinction because all such practices jeopardize the right to secrecy of the ballot.  **The declaration operates to discourage citizens from participation in the electoral process simply because they do not wish people to know how they will vote.  Such a revelation invokes the fears sought to be quelled by the secrecy of voting laws in this country, and subjects an elector to the pressure of his neighbours, employers, and social peers.  Since the declaration abridges the right to a secret ballot in such a direct and unacceptable manner, it cannot stand.**

Id. at 608-09 (emphasis added).

Citing <u>Brown</u> and <u>Mills</u>, other courts have also held various state laws unconstitutional under the First and/or Fourteenth Amendments for requiring or adversely impacting a voter because the voter signed a political party's petition. A West Virginia law deemed a voter's signature on a minor political party's petition for ballot access to forfeit that voter's right to vote for any other candidate, and the Fourth Circuit held that law to violate the First and Fourteenth Amendments. <u>Socialist Workers Party v. Hechler</u>, 890 F.2d 1303, 1309 (4th Cir. 1989).

Several district courts have held various state laws that require disclosure of a voter's affiliation with a minor political party unconstitutional under the First and/or Fourteenth Amendments. <u>See</u> <u>Workers World Party v. Vigil-Giron</u>, 693 F. Supp. 989, 994-98 (D.N.M. 1988) (by signing a part recognition petition, voters represent that they are "members of the political party submitting the petition"); <u>Libertarian Party of Nevada v. Swackhamer</u>, 638 F. Supp. 565, 566, 568-69 (D. Nev. 1986) (enjoining Nevada statute providing that by signing a minor political party's petition for ballot access, the voter signatories were "declaring that they represent a political party"); <u>Libertarian Party of Nebraska v. Beerman</u>, 598 F. Supp. 57, 63-64 (D. Neb. 1984) (holding unconstitutional a Nebraska law that voter signing ballot access petition was required "to pledge to support the new party"); <u>Libertarian Party of South Dakota v. Kundert</u>, 579 F. Supp. 735, 737-39 (D.S.D. 1984) (South Dakota law that by signing a ballot access petition the voter was making a "statement that the subscribers thereto have affiliated one with another for the purpose of forming a party" held unconstitutional); <u>North Carolina Socialist Workers Party v. North Carolina State Board of Elections</u>, 538 F. Supp. 864, 867-68 (E.D.N.C. 1982) (North Carolina law that a voter signing a new party's political petition would automatically change the voter's political affiliation held unconstitutional).

In 1999, the then Tennessee Attorney General similarly opined that Tennessee membership requirement for signing ballot access petitions, then Tenn. Code Ann. § 2-1-104(a)(28)(B), violated the First Amendment. Tenn. Op. Atty. Gen. No. 99-121, 1999 WL 322047 at *1, 2 (Tenn. A.G. May 19, 1999).

Applying the principles of Brown and Mills and the cited district court decisions here, the Court concludes that Plaintiffs' First Amendment right to associate as a political party and Tennessee voters' First Amendment right to privacy of their political affiliation are violated by this state compelled disclosure in Tenn. Code Ann. §2-1-104(a)(30). This statutory requirement also burdens a voter's political speech in communicating the voter's interest in another option(s) among political parties in primary and general elections in Tennessee. As quoted above, the Supreme Court described minor political parties as channels for public dissent and public policy alternatives. A comparison of the historical record of Tennessee's election experiences with minor political party participation before the enactment of Section 2-10-104(a)(30)(B) and the level of minor political parties' participation after its enactment reveals the stark contrast and the undue burden of this statute on minor political parties and its members. The State's lack of a legitimate interest in this statute's requirement of disclosing party membership in the minor political party is reflected in the Defendants' concession that they do not enforce this statute. In sum, the Court concludes that the "membership" provision of Tenn. Code Ann. § 2-1-104(a)(30)(B) constitutes an unjustifiable burden and violates Plaintiffs' First Amendment rights to vote, Tennessee voters' right to privacy in their political affiliation, and Plaintiffs' right to associate as a political party.

In distinguishing the relevant decisions, Defendants cited their non-enforcement of this statutory membership requirement. The Defendants' failure to enforce the statute cannot trump

30

the First Amendment right of voters to preserve the privacy of their political membership. Moreover, the Defendants' non-enforcement decision is an inappropriate focus to evaluate the impact of this statute's party membership provision. The relevant focus for this membership requirement is when the minor political party members attempt to collect voter signatures. At that point, the State's invasion of the voter's privacy occurs and the chilling effects of the statute arise because to sign the minor political party's petition for ballot access as a statewide political party requires the voter to join or to be a member of that party. These adverse impacts occur before Defendants decide whether to enforce this State law. Although Defendants note that their pamphlet and sample for political party petitions do not list party membership, this pamphlet does not tell Plaintiffs to ignore this State law membership requirement. In any event, the decisions in <u>Brown</u> and <u>Mills</u> are controlling. Defendants also cite <u>Jenness v. Fortson</u>, 403 U.S. 431, 438-39 (1971), upholding Georgia ballot laws, but <u>Jenness</u> did not mandate the disclosure of party membership nor does Tennessee's statute have any of the cited saving characteristics of the Georgia statute.

### b. The 2.5% Requirement and 120 Days Deadline

As to Plaintiffs' challenges to the 2.5% requirement of Tenn. Code Ann. § 2-1-104(a)(29) and the State Election Coordinator's 120 days deadline, <u>Blackwell</u> requires these claims to be viewed in combination as well as with the cited party membership requirement in Section 2-1-104(a)(30). The constitutional "inquiry is not whether each law individually creates an impermissible burden **but rather whether the combined effect of the applicable election regulations** creates an unconstitutional burden on First Amendment rights. <u>Blackwell</u>, 462 F.3d at 586 (citing <u>Williams</u>, 393 U.S. at 34) (emphasis added).

31

As to the statutory requirement of 2.5% of the total vote in the last gubernatorial election, the Defendants cite multiple decisions of the Supreme Court upholding as high as five percent (5%) of the total vote for political party recognition and ballot access as constitutional. See e.g., American Party of Texas v. White, 415 U.S. 767, 789 (1974) ("Demanding signatures equal in number to 3% or 5% of the vote in the last election is not invalid on its face"); Storer, 415 U.S. at 739-40 (5% requirement not facially unconstitutional); Jenness, 403 U.S. at 438-39 (upholding Georgia statue requiring signatures of 5% of registered voters before independent candidates could be placed on ballot). To be sure, other circuits have upheld higher percentage requirements. Cartwright v. Barnes, 304 F.3d 1138, 1141, 1142 (11th Cir. 2002) (reaffirming constitutionality of Georgia 5% signature requirement); Rainbow Coalition of Okla. v. Oklahoma State Election Bd., 844 F.2d at 741-42, 744 (10th Cir. 1988) (upholding Oklahoma statue requiring signatures of 5% of the number of votes cast in the most recent election)

Other Circuits have upheld state laws requiring 2% to 3% of the total vote for ballot access as a recognized political party. Swanson v. Worley, 490 F.3d 894, 905 (11th Cir. 2007) (upholding Alabama statute requiring independent candidates obtain signatures of 3% of vote in last gubernatorial election); Rogers v. Corbett, 468 F.3d 188, 195 (3rd Cir. 2006) (uphold Pennsylvania statutes requiring candidate of minor political party obtain signatures of 2% of vote in last election); Libertarian Party of Florida v. Florida, 710 F.2d 790, 792-95 (11th Cir. 1983) (upholding Florida statute requiring minor party candidate obtain signatures of 3% of all registered voters to appear on general election ballot).

Defendants argue that the 2.5% requirement in Section 2-1-104(a)(29) serves Tennessee's interest as recognized in Storer, namely, a "statewide, ongoing organization with distinctive political character." 415 U.S. 745. The Court agrees that the 2.5% requirement alone

32

is a reasonable state regulation for the reasons set forth by the esteemed late jurist William M. Leech, sitting as Special Justice in Tennessee Libertarian Party v. Democratic Party, 555 S.W.2d 102, 103-05 (Tenn. 1977). Yet, given the nature of the Plaintiffs' challenges in this action and Blackwell's standard for constitutional analysis, this 2.5% requirement cannot be considered in a vacuum[5], but in its interrelationship with the membership requirement of Section 2-1-104(a)(30) and the State election officials' 120 days deadline for minor political parties' petition seeking ballot access as a statewide political party.

The State Coordinator of Elections requires petitions to obtain recognition as a statewide political party to be filed at least thirty days before the qualifying deadline for the August state primary, i.e., the first Thursday in March of the election year, creating the 120 days requirement. Tennessee's 120 days deadline is based upon: the State election officials' policy to add 30 days to the initial period to allow state and local election officials to verify the signatures on the new political party petition. There is not any deadline, however, for the State election officials' decisions. Plaintiffs note that in Tennessee, a new political party can only elect a state executive committee after State election officials certify its petition to be a statewide political party. This 120 days deadline, occurring on the first Thursday in March of the election year, is at least 8 months prior to the general election in November. The effect of this 120 days deadline in March

---

[5] See Libertarian Party of Florida v. Florida, 710 F.2d 790 (11th Cir. 1983):

> [A]ny percentage or numerical requirement is "necessarily arbitrary." Once a percentage or number of signatures is established, it would probably be impossible to defend it as either compelled or least drastic. At any point, probably a fraction of a percentage point less, or a few petitioners less would not leave the interests of the state unprotected. Any numerical requirement could be challenged and judicially reduced, and then again, and again until it did not exist at all. This is not the thrust of the Court's teachings, however. Rather, a court must determine whether the challenged laws "freeze" the status quo by effectively barring all candidates other than those of the major parties, and provide a realistic means of ballot access. The focal point of this inquiry is whether a "reasonably diligent [ ] candidate [can] be expected to satisfy the signature requirements." (emphasis added).

Id. at 792 (internal citations omitted).

means that for statewide recognition, the new political party would likely have to initiate its

petition campaign in at least January or February, if not earlier.

The Supreme Court expressly recognized the significance of time in a voter access action

arising out of Tennessee:

> **Given modern communications, and given the clear indication that campaign spending and voter education occur largely during the month before an election**, the State cannot seriously maintain that it is 'necessary' to reside for a year in the State and three months in the county in order to be knowledgeable about congressional, state, or even purely local elections.

Dunn v. Blumstein, 405 U.S. 330, 358 (1972) (emphasis added). Dunn held Tennessee's one

year residency requirement for voters to violate the equal protection clause of the Fourteenth

Amendment. Id. at 342, 352, 360.

In Anderson, the Supreme Court addressed the adverse impact of a State's early

registration on a presidential candidate and voters:

> An early filing deadline may have a substantial impact on independent-minded voters. In election campaigns, particularly those which are national in scope, the candidates and the issues simply do not remain static over time. Various candidates rise and fall in popularity; domestic and international developments bring new issues to center stage and may affect voters' assessments of national problems. Such developments will certainly affect the strategies of candidates who have already entered the race; they may also create opportunities for new candidacies. Yet **Ohio's filing deadline prevents persons who wish to be independent candidates from entering the significant political arena established in the State by a Presidential election campaign-and creating new political coalitions of Ohio voters-at any time after mid-to-late March. At this point developments in campaigns for the major-party nominations have only begun, and the major parties will not adopt their nominees and platforms for another five months. Candidates and supporters within the major parties thus have the political advantage of continued flexibility; for independents, the inflexibility imposed by the March filing deadline is a correlative disadvantage because of the competitive nature of the electoral process**

*  *  *

The name of the nominees of the Democratic and Republican parties will appear on the Ohio ballot in November even if they did not decide to run until after Ohio's March deadline had passed, but the independent is simply denied a position on the ballot if he waits too long. Thus, **under Ohio's scheme, the major parties may include all events preceding their national conventions in the calculus that produces their respective nominees and campaign platforms, but the independent's judgment must be based on a history that ends in March.**

460 U.S. at 790-91, 799-800 (emphasis added). "The right to vote is 'heavily burdened' if that vote may be cast only for major-party candidates at a time when other parties or other candidates are "clamouring for a place on the ballot." . . . . Id. at 787-88 (citing Williams, 393 U.S. at 31). Moreover, "the right to form a party for the advancement of political goals means little if a party can be kept off the election ballot and thus denied an equal opportunity to win votes." Id.

In Blackwell, Ohio's political party registration requirement amounted to only one percent of the total vote cast in the previous election. 462 F.3d at 583. Yet, this fact did not preclude the Court's conclusion that Ohio's 120 days deadline rendered Ohio's scheme unconstitutional where the 120 days deadline was a year prior to the general election. In Blackwell, the Sixth Circuit recognized the impact of the timing of state filing deadlines for minor political parties:

> Deadlines early in the election cycle require minor political parties to recruit supporters at a time when the major party candidates are not known and when the populace is not politically energized. In this case, the LPO needed to find more than thirty thousand Ohio residents to sign its petition to appear on the 2004 ballot more than one year in advance of the election. Early deadlines also have the effect of ensuring that any contentious issue raised in the same year as an election cannot be responded to by the formation of a new political party. The combination of these burdens impacts the party's ability to appear on the general election ballot, and thus, its opportunity to garner votes and win the right to govern.

*    *    *

We find both the reasoning and the conclusions of these courts to be compelling. Ohio's deadline in the November preceding the election is the earliest of any deadline reviewed by a federal court. **It is 120 days in advance of the primary**

35

> **election and 364 days ahead of the general election for which the party wishes to appear on the ballot. This deadline imposes a severe burden on the First Amendment rights of the LPO.**

462 F.3d at 586. See also New Alliance Party of Ala. v. Hand, 933 F.2d 1568, 1576 (11th Cir. 1991) ("No one can seriously contend that a deadline for filing for a minor party and its candidates seven months prior to the [general] election is required to advance legitimate state interests.").

As stated in Blackwell, the Sixth Circuit cited and relied upon decisions in other Circuits and district courts holding State deadlines of 60 days and 90 days prior to a primary as creating burdens for minor political parties and voters. 462 F.3d at 586 (citing Council of Alternative Parties v. Hooks, 121 F.3d 876, 880 (3d Cir. 1997) (60 days deadline before primary an undue burden because "the election is remote and voters were generally uninterested in the campaign")); McLain v. Meier, 851 F.2d 1045, 1050-51 (8th Cir. 1988) ( Nebraska's February deadline 90 days prior to the primary unconstitutional). Other district courts in this Circuit have stricken state deadlines for lesser periods of time than Tennessee's 120 days deadline. See Libertarian Party of Kentucky v. Ehrler, 776 F. Supp. 1200, 1205-06 (E.D. Ky. 1991) (holding deadline of 119 days prior to the primary an unconstitutional burden on voters and minor political parties); Cripps v. Seneca County Bd. of Elections, 629 F. Supp. 1335, 1338 (N.D. Ohio 1985) (deadline of 75 days before the primary for independent candidates violates the First Amendment).

In its conclusion in Blackwell, the Sixth Circuit also observed that the ". . . evidence in the record show[s] that in Ohio, elections have indeed been monopolized by two parties, and thus, the burdens imposed by the state's election laws are 'far from remote. . . .Ohio is among the most restrictive, if not the most restrictive, state in granting minor parties access to the ballot. Of

the eight most populous states, Ohio has had by far the fewest minor political parties on its general election ballot.'" 462 F.3d at 589 (citing California Democratic Party v. Jones, 530 U.S. 567, 578 (2000)).

As these precedents are applied here, the time differential between the State's 120 days deadline and the Tennessee general election is 8 months, but its practical effect requires a minor political party to commence its petition activity 10 months or more before a general election in Tennessee. Although Ohio's 120 days deadline in Blackwell created a 12 month differential, Anderson and the decisions approvingly cited in Blackwell recognize the adverse impact on voters and minor political parties of a deadlines less than 120 days prior to the primary. The unconstitutional requirement of disclosure of a voter's party membership adds to the infirmity of this 2.5% statute and the 120 days deadline. In addition, a comparison of minor political parties' participation in Tennessee elections prior to the enactment of these statutes with minor political parties' participation after these statutes were enacted in 1961 reveals the undue burden and adverse impact of these State laws on minor political parties, their members and Tennessee voters. In addition, Plaintiffs have proven their and other minor political parties' multiple unsuccessful efforts at obtaining recognition as a statewide political party in Tennessee. Plaintiffs' expert proof is that compliance with Tennessee's requirements for recognition as a statewide political party as "impossible, or virtually impossible". (Docket Entry No. 25-3, Amended Expert Report at 7).

Under these collective circumstances, the Court concludes that Tennessee's 120 days deadline, coupled with Section 2-1-104(a)(30)'s requirement of disclosure of a voter signatory's party membership and the 2.5% requirement of Section 2-1-104(a)(29) unduly burden the individual Plaintiffs' First Amendment right to vote, the Plaintiff political parties' and their

37

members' First Amendment right to associate as a political party and Tennessee voters' First Amendment right to privacy of their political affiliation with a minor political party.

Defendants contend that Tennessee's statutory restrictions do not impact the ballot access of presidential candidates and a separate Tennessee statute governs ballot access for non-statewide party candidates. Tenn. Code Ann. § 2-05-208(d)(1). Presidential candidates for Tennessee elections are required to file a qualifying petition with 25 signatures of registered voters by the third Thursday in August preceding the November general election. Tenn. Code Ann. § 2-5-101(a) and (b)(1). Yet, Plaintiffs do not challenge these statutes. Political parties and their members possess distinct political rights. Moreover, the presence of some minor political parties on presidential ballots in Tennessee does not address the minor political parties' inability to compete in the other statewide races for which a statewide political party must field a candidate. Defendants next contend that Tennessee's petition process is more similar to the new party recognition statutes in Oklahoma that was upheld in Rainbow Coalition of Oklahoma v. Oklahoma State Election Board, 844 F.2d 740 (10th Cir. 1988). There, however, the deadline was 55 days in advance of the primary election.

As to the requirements of Tenn. Code Ann. § 2-13-202 that a statewide political party must submit candidates Governor, Members of the General Assembly, United States Senator and Members of the United States House of Representatives, the Court concludes that Plaintiffs have not demonstrated that these provisions burden their First Amendment rights. This statute furthers a relevant state interest in requiring political parties to compete statewide to be deemed a statewide political party. As such, Defendants' motion for summary judgment should be granted as to Plaintiffs' challenge to the 2.5% statute.

For the above stated reasons, the Court concludes that the undisputed historical facts and controlling precedents establish that Section 2-1-104(a)(30) violates Plaintiffs' First Amendment rights to vote, Tennessee voters' First Amendment right to the privacy of their political affiliation, and to Plaintiffs' First Amendment right to associate as a political party. The Court also concludes that Plaintiffs have demonstrated that Tennessee's 2.5% requirement in Section 2-1-104(a)(29), coupled with the party membership requirement in Section 2-1-104(a)(30) and the state's 120 day deadline for new political parties, effectively preclude minor political party participation in state and national elections in Tennessee.

An appropriate Order is filed herewith.

**ENTERED** this the ___20th___ day of September, 2010.

William J. Haynes, Jr.
United States District Judge

39